UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| TONY NUNEZ, et al., | Case No. 17-CV-03860-LHK |
| Plaintiffs, | **ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |
| v. | |
| CITY OF SAN JOSE, et al., | Re: Dkt. No. 66 |
| Defendants. | |

Plaintiffs Tony Nunez and the Estate of Anthony Nunez by and through its personal representative Sandy Sanchez (collectively, "Plaintiffs") bring this suit against Defendants City of San Jose, San Jose Police Department ("SJPD") Officer Michael Santos ("Officer Santos"), individually and in his capacity as an officer, and SJPD Officer Anthony Vizzusi ("Officer Vizzusi"), individually and in his capacity as an officer (collectively, "Defendants") for the shooting of Tony Nunez's son, Anthony Nunez. Before the Court is Defendants' motion for summary judgment. ECF No. 66 ("Mot."). Having considered the parties' briefing, the relevant law, and the record in the case, the Court GRANTS IN PART AND DENIES IN PART Defendants' motion for summary judgment.

## I. BACKGROUND

### A. Factual Background

This case arises from the fatal shooting of Plaintiff Tony Nunez's son, Anthony Nunez ("Nunez") by SJPD Officers Santos and Vizzusi on July 4, 2016.

In the days leading up to July 4, 2016, 18-year-old Nunez was sad and said he wanted to die. ECF No. 66-1 ("Chow Decl"), Ex. A ("Cervantes Dep.") at 38:8–40:15; ECF No. 69-17 ("Buelna Decl."), Ex. 10 ("Coroner's Report). On July 4, 2016, sometime before 4:51 p.m., Nunez shot himself in the head at his home, located at 994 Feller Avenue in San Jose, California. *See* Coroner's Report.

On July 4, 2016, Juan Cervantes, Nunez's cousin, found Nunez lying face down in bed, holding a gun, and bleeding from the self-inflicted gunshot wound to the head. Cervantes Dep. at 56:16–57:25. Cervantes turned Nunez around and took the gun away from him. *Id.* at 61:22–25, 62:1–63:10. Nunez asked for the gun back. *Id.* When Cervantes declined, Nunez asked Cervantes to shoot him. *Id.* Cervantes then called the police. *Id.* 63:18–65:8. While Cervantes was on the phone, Cervantes walked down to the corner of Feller and Story. *Id.* While Cervantes was on the phone, Nunez followed him all the way to the corner, and asked again for the gun. *Id.* The two then went back into the house. *Id.*

Cervantes testified that he put the gun in the backyard. *Id.* at 66:25–67:3. When the police arrived, Cervantes went outside to meet the police and told the police that Nunez was in the house and needed help. *Id.* at 80:5–82:9. Cervantes testified that the police searched Cervantes and then took him to a vehicle. Cervantes testified: "[w]hen they placed me inside the car, a little while after, I heard two shots. After that, they did like a handshake or a like a [high] five, like celebrating or something, like it was a good shot." *Id.*

In the subsections that follow, the Court reviews the incident from the perspective of each officer and witness as well as the security camera footage and cell phone videos.

### 1. Sergeant Thomas Boyle

Sergeant Thomas Boyle ("Sgt. Boyle") responded to 994 Feller Avenue after learning that

a relative of a suicidal person called in and reported that his family member had shot himself in the head. Buelna Decl., Ex. 1 ("Boyle Dep.") at 26:22–28:25. Sgt. Boyle heard several units responding and asked dispatch for more details on his way over. *Id.* at 28:5–29:22.

On the way there, Sgt. Boyle "made the decision to have the reporting party [(Cervantes)] take the gun and throw it in the backyard." *Id.* at 29:23–25, 31:1. When Sgt. Boyle arrived at 994 Feller Avenue, Cervantes had already left the house and was in custody of the officers. *Id.* at 30:11–25. Lieutenant Paul Joseph ("Lt. Joseph") later testified at his deposition that he heard Sgt. Boyle's instruction for the gun to be placed in the backyard, and that "[i]t's not a direction I would have given myself." Buelna Decl., Ex. 2 ("Joseph Dep.")[1] at 30:23–32:25. Sgt. Boyle testified that he would expect his officers to communicate to him over the radio if Nunez pointed the gun at anyone. Boyle Dep. at 50:11–51:8.

### 2. Officer Rubens Dalaison

Officer Rubens Dalaison ("Officer Dalaison"), an officer with crisis intervention team training, was one of the SJPD officers who responded to the call for service at the Feller Avenue address on July 4, 2016. Chow Decl., Ex. B ("Dalaison Dep.")[2] at 22:3–24:24, 27:17–22, 32:15–25. As Officer Dalaison drove towards the Feller Avenue address, the dispatcher informed him that Nunez was suicidal, had a weapon, and had possibly shot himself, and that other officers were setting up a containment perimeter. *Id.* at 32:1–33:21, 37:20–24.

When Officer Dalaison arrived at the scene, Officer Dalaison stationed himself across the street from the Feller Avenue house near a tan Chevrolet Suburban. *Id.* at 44:7–22. Officer Dalaison first saw Nunez appear at the threshold of the front door of the house holding a gun as a contact team of officers was approaching, so Officer Dalaison called out "[s]top, man with a gun," and the team retreated. *Id.* at 49:23–52:25, 55:20–56:20. The contact team stopped and retreated to

---

[1] Excerpts of Lt. Joseph's deposition are attached as Exhibit 2 to the Buelna Declaration and as Exhibit E to the Chow Declaration. For simplicity, the Court refers only to the "Joseph Dep."
[2] Excerpts of Officer Dalaison's deposition are attached as Exhibit B to the Chow Declaration and as Exhibit 5 to the Buelna Declaration. For simplicity, the Court refers only to the "Dalaison Dep."

Case No. 17-CV-03860-LHK
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

the corner of Story and Feller while Officer Dalaison tried to get Nunez's attention. *Id.* at 50:9–23.

Officer Dalaison noticed Nunez's head was bleeding and concluded that he had shot himself. *Id.* at

57:1–16. Officer Dalaison also noticed that Nunez was sluggish, like he had got his "bell rung"

and suffered a concussion to the head. *Id.*

Nunez stayed in the threshold of the door for approximately seven to ten minutes. *Id.* at

60:2–23. During that time, Officer Dalaison observed Nunez raise the gun to his head about four

times and Officer Dalaison pleaded to Nunez not to shoot himself. *Id.* at 59:20–62:9. Officer

Dalaison asked Nunez to put the gun down and come out to get medical attention. *Id.* at 64:13–17,

66:23–67:16. Nunez did not come out and instead went back inside the house for a couple of

minutes. *Id.* at 62:11–15, 63:24–64:3.

While Nunez was inside the house, Officer Dalaison moved to where two other officers,

Officer Vizzusi and Officer Aneez Raghavan ("Officer Raghavan"), had positioned themselves

further away from the residence near a blue pickup truck. *Id.* at 69:14–71:9.

Nunez next reappeared in the doorway and stepped out onto the porch. *Id.* at 73:4–19.

Officer Dalaison testified at his deposition that Nunez's demeanor at that point seemed to be more

"crisp," "sturdy," and "intentional." *Id.* Officer Dalaison yelled out to Nunez to "[p]ut the gun

down," and at the time same, Officer Dalaison testified that Officer Dalaison "turned around to

move [him]self back to where Vizzusi was at." *Id.* at 73:12–75:15. Officer Dalaison testified that

the last thing he saw as he turned was that Nunez was moving forward with the gun in his right

hand at or above the waistline, with his arm bent. *Id.* at 75:2–7. As he relocated, Officer Dalaison

heard two, almost simultaneous shots. *Id.* at 73:23–74:7, 77:6–25, 78:11–80:4. Officer Dalaison

testified that he did not see Nunez twirling the gun in his finger. *Id.* at 78:23–24. Officer Dalaison

did not include facts about Nunez's demeanor or the position of the gun in Nunez's hand, with the

exception that the gun was in Nunez's right hand, in the police report that he wrote on July 4,

2016. *See* Buelna Decl., Ex. 16 ("Dalaison Police Rpt.").

### 3. Officer Anthony Vizzusi

4

On July 4, 2016, SJPD Defendant Officer Vizzusi and his partner, Officer Raghavan, responded to a dispatch indicating there was a suicidal subject with a gun at 994 Feller Avenue. Chow Decl., Ex. F ("Vizzusi Dep.")[3] at 27:6–28:16. Officer Vizzusi also learned from the dispatch that Nunez had shot himself in the head, that someone was trying to separate a firearm from Nunez, and that someone had requested that someone throw a firearm in the backyard. *Id.* at 29:18–25. Officer Vizzusi and Officer Raghavan approached the Feller Avenue house driving south on Feller after hearing Officer Dalaison's radio call stating that Nunez had come out of the front door holding a firearm. *Id.* at 30:1–34:20.

The officers arrived and parked their car three to five houses down from 994 Feller Avenue. *Id.* at 34:1, 37:23–38:7. As Officer Vizzusi exited the patrol car, Officer Vizzusi saw Nunez on the front porch holding a handgun in his hand at his side. *Id.* at 41:1–42:18. Officer Vizzusi also saw Officer Dalaison, who was holding his service weapon at his side and trying to talk Nunez into dropping the gun. *Id.* at 42:13–43:13. Officer Vizzusi testified that Nunez appeared to be "not all there," and that he "[d]idnt appear to respond to anything from—like Officer Dalaison was saying." *Id.* at 70:21–25.

Defendant Officer Vizzusi took position behind a 1960s Chevy pickup that was located somewhere to the left of Nunez's residence, and placed his rifle on top of the hood. Officer Vizzusi watched Nunez, who remained in front of the house holding the handgun, through the three-power magnifier on his rifle. *Id.* at 19:4–9, 21:22–25, 52:25–53:1, 60:1–65:25, 66:21–67:2, 83:24–84:4, 6:12–14. Officer Vizzusi testified that his concern increased because Nunez refused to drop the gun. *Id.* at 78:12–79:3. Officer Vizzusi testified that at the time Nunez was first out on the porch, Officer Vizzusi did not see Nunez raise the gun up from his side. *Id.* at 64:1–12. Officer Vizzusi testified at his deposition that he "never saw Mr. Nunez raise the gun to his own head" and that "[p]rior to him coming back out, I did not see him raise a gun to any officers." *Id.* at

---

[3] Excerpts of Officer Vizzusi's deposition are attached as Exhibit F to the Chow Declaration and as Exhibit 4 to the Buelna Declaration. For simplicity, the Court refers only to the "Vizzusi Dep."

Case No. 17-CV-03860-LHK
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

66:8–15. Officer Vizzusi then observed Nunez walk inside the house.

Officer Vizzusi testified that he then saw Nunez come back outside a second time and that Nunez "end[ed] up raising the firearm—twirling the firearm and then raising it" to about the level of his sternum. *Id.* at 64:1–12, 91:2–92:12. Officer Vizzusi explained: "it appeared that he was twirling the gun in front of him, and at one point he stop[ped] and he started to lift his gun—you know, lift his hand higher than where he was twirling it." *Id.* at 92:22–25. "At the point that—just about the point when he stopped twirling the gun and he started to lift the gun in our direction, I fired." *Id.* at 93:7–9. Officer Vizzusi testified that "[a]t the time I fired, I feared for my own safety, the officers that were on scene, and any other persons that may have been in that area." *Id.* at 94:5–7. Just prior, but almost simultaneously to pulling the trigger of his rifle, Officer Vizzusi heard another gunshot. *Id.* at 93:22–25.

### 4. Officer Michael Santos

Defendant Officer Santos fired the other shot that Officer Vizzusi had heard.

On July 4, 2016, Defendant Officer Santos also responded to the scene pursuant to a priority dispatch describing a possibly suicidal man with a gun. Chow Decl., Ex. G ("Santos Dep.")[4] at 31:10–14. Officer Santos parked his car on Story Road, just west of Feller Avenue and met with the officers on the scene to discuss the details of the case, the perimeter, and what the next course of action would be. *Id.* at 33:18–34:15, 35:9–25. Officer Santos learned there was a person with a gun inside the residence with the reporting party, who was a relative in contact with a dispatcher. *Id.* at 35:9–25. Officer Santos then gathered his rifle, which was equipped with a three-power magnifier, and ballistic vest, and set up by a tree in a yard on the northwest corner of the Story Road and Feller Avenue intersection where he could see the front of the house through the magnifier on his rifle. *Id.* at 23:2–14, 36:1–39:10.

At some point Officer Santos learned that Cervantes had the gun and was advised to throw

---

[4] Excerpts of Officer Santos's deposition are attached as Exhibit G to the Chow Declaration and as Exhibit 3 to the Buelna Declaration. For simplicity, the Court refers only to the "Santos Dep."

Case No. 17-CV-03860-LHK
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

the gun into the backyard. *Id.* at 43:8–10. Cervantes then ran out of the house, yelling at the officers to "go help him" and that Nunez was "hurt" and "bleeding." *Id.* at 43:16–48:9. The officers took Cervantes into custody. *Id.*

Sgt. Boyle then directed Officer Santos and approximately four other officers to form a contact team to approach the 994 Feller Avenue house. *Id.* at 52:16–56:23. Officer Santos was the cover rifle officer with the team. *Id.* at 57:14–15. Prior to approaching the house, Officer Santos learned that Nunez was suicidal and had shot himself in the head. *Id.* at 55:13–56:9. As Officer Santos approached the house with the contact team, he heard other officers say "[h]e's at the door. He's got a gun." *Id.* at 56:19–24. Defendant Officer Santos and the other officers then retreated back to their positions at the corner of Story and Feller. *Id.* at 57:9–20.

Officer Santos then relocated to the porch of a house across the street from Nunez's residence to get a better angle to cover the other officers. *Id.* at 58:9–25, 60:18–61:13. At this point, Officer Santos was positioned to the right of Nunez's residence, effectively opposite from Officer Vizzusi, who was located to the left of Nunez's residence. From his new position, Officer Santos observed Nunez through his magnifier and his naked eye. *Id.* at 66:21–25. Officer Santos saw Nunez come out of the house, scan the area while holding a gun in his right hand, and then go back into the house. *Id.* at 61:22–66:16. Officer Santos testified that during this time he observed Nunez raise the gun up a couple of times, but that he never saw Nunez raise the gun to his head. *Id.* Officer Santos also testified that Nunez raised the gun towards the general direction of the officers once. *Id.* at 65:15–16.

Officer Santos then observed Nunez come back out of the house a second time and "immediately engage[ ] the officers to the northwest." *Id.* at 72:16–73:6. Officer Santos observed that Nunez was twirling the gun in his right hand at "a 90-degree angle, straight out." *Id.* at 73:5–74:25. Officer Santos observed Nunez twirl the gun approximately three times and then "stop[ ] and very deliberately point[ ]" the gun in the direction of the officers to the northwest. *Id.* at 74:1–75:25. Officer Santos then fired at Nunez. *Id.* at 76:1–14. Officer Santos did not hear gunfire prior

7

to pulling his own trigger. *Id.*

Officer Santos testified at his deposition that he estimated that the time from when Nunez walked out of the house the second time to the time that Officer Santos fired was less than 10 seconds. *Id.* at 73:19–74:7. Officer Santos testified at his deposition that he does not remember if he shot Nunez in the chest or the back. *Id.* at 76:19–77:24. Officer Santos was positioned to the right of Nunez's residence, effectively opposite from Officer Vizzusi, who was located to the left of Nunez's residence.

After the shooting, Officer Santos was sequestered and did not speak with Officer Vizzusi or Officer Dalaison before giving a statement. *Id.* at 80:20–81:13.

### 5. Officer Aneez Raghavan

On July 4, 2016, after arriving at the scene, Officer Vizzusi's partner, Officer Raghavan, learned from Officer Dalaison that there was someone inside the house that had shot themselves in the head and that their cousin had come out of the house. Buelna Decl., Ex. 7 ("Raghavan Dep.") at 30:18–31:22.

Officer Raghavan testified at his deposition that when he first saw Nunez step out onto the porch, he did not see anything in Nunez's hands. *Id.* at 36:20–37:4. Specifically, Officer Raghavan was asked "And do you recall if he had anything in his hands?" to which Officer Raghavan responded "Nothing." Officer Raghavan was also asked "He didn't have anything in his hands?" to which Officer Raghavan responded "Initially, no." *Id.* During that time, Officer Raghavan kept his weapon at a "low ready" so that he would be able to react in an "appropriate and quick manner." *Id.* at 40:3–41:19. Officer Raghavan then observed Nunez go back into the house, and Officer Raghavan called Officer Dalaison over to where Officer Raghavan and Officer Vizzusi were positioned down the street to the left of Nunez's residence. *Id.* at 41:20–43:9.

Officer Raghavan then observed Nunez reappear on the porch for a second time. *Id.* at 45:5–7. Officer Raghavan saw Nunez reach into his side waistband, pull out a gun, and twirl it forward and back. *Id.* at 45:8–47:2. Officer Raghavan then saw Nunez grab the handle of the gun

8

and point it in the direction of the officers. *Id.* at 57:5–9. Officer Raghavan testified that he was about to fire when he heard two shots. *Id.*

### 6. Neighbor Charles Thomas

Neighbor Charles Thomas ("Thomas") lives in a house, which is across the street from Nunez's residence. Buelna Decl., Ex. 6 ("Thomas Dep.")[5] at 14:4–25. Thomas was at home talking on the phone with a neighbor, who was in Mexico, when the incident occurred, and Thomas saw Nunez get shot from his kitchen window. *Id.* at 44:11–13, 102:10–104:10.

Thomas testified that on the day of the incident, he observed a man appear in the doorway of the 994 Feller Avenue house, look both ways, and then disappear inside the home. *Id.* at 38:1–43:19. Thomas does not know the man's name and did not identify the man as Nunez during Thomas's deposition. Nonetheless, for simplicity in this Order, the Court will refer to the man as Nunez when discussing Thomas's testimony. Thomas testified at his deposition that he did not see anything in Nunez's hands at that time. *Id.* at 41:17–24. After one or two minutes, Thomas observed Nunez come out of the house again and onto the porch. *Id.* at 43:22–44:13. Thomas then heard two shots and observed Nunez stagger and fall. *Id.* at 44:18–45:25.

At his deposition, Thomas was asked with regards to the moment Nunez was shot, "when you saw [Nunez] come out, did he have anything in his hands," to which Thomas responded "No." *Id.* at 46:3–23. Thomas clarified that his view of Nunez's hands was blocked because Nunez's hands were down by his side, but if Nunez had raised his hands up, then Thomas would have been able to see Nunez's hands, but Thomas did not. *Id.* at 46:1–49:11, 90:23–91:11. Specifically, the deposition testimony was as follows:

> MS. CHOW: For the record, Mr. Thomas's hands, when he was making the explanation, his hands were down by his side at one point.
>
> MR. BURRIS: Right.

---

[5] Excerpts of Thomas's deposition are attached as Exhibit 6 to the Buelna Declaration and as Exhibit I to the Chow Declaration. For simplicity, the Court refers only to the "Thomas Dep."

Case No. 17-CV-03860-LHK
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

MS. CHOW: And then you raised your hands up to around waist level.

THE WITNESS: No, no, no. I said I would have seen it.

MS. CHOW: You would have seen it if his hands were up—

THE WITNESS: Yes, if he something — exactly, if something in his hand. If something like this, I cannot see —.

Thomas at 46:13–47:25.

Thomas's deposition testimony is somewhat unclear because he does not describe on the record the gestures he makes. Later testimony somewhat clarifies Thomas's statements:

Q: Now, earlier, I think you had been discussing when, during the incident, you might have been able to see his hands, and I think you had gestured that if the young man had been standing in the doorway or on the porch with his hands down by his side, you may not have been able to see his hands. Is that right?

A: That's correct. Yes, that's correct.
. . .
Q: And at no point in time did you see him raise his – or at any point in time, did you see him raise his hands as if he was pointing something at you or anyone else?

A: No, because –
. . .
– because that brought back my memory, too, because I was asked that question "Did you see a gun?"
I said– and I told the detective and I told the policeman, just like I told John, if it was like this (indicating), I wouldn't miss it. If it's like this (indicating), I didn't see it.
"So if you guys saw a gun, you saw a gun. I did not see a gun."
The only way I would see, if it's point [sic], because the hand is beyond the side, and that I would see.
So I mean, the detective asked me that question, the policeman asked me that question, and he asked me that question.
That I cannot help you because – but if it's like this (indicating), I can say, sure I saw it. But if it's like this (indicating), I cannot – I cannot show you if he has a gun or not.

BY MR. BURRIS:
Q: So just for the record to be clear, that you moved your hands in such a way that if it was up, you could have seen it. If his hands were down, you couldn't have seen it.

*Id.* at 90:23–91:4, 105:15–106:20. Thomas testified that he did not see Nunez raise either hand prior to being shot. *Id.* at 46:1–49:11, 90:23–91:11; *see also id.* at 56:2–9.

Case No. 17-CV-03860-LHK
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

However, Thomas testified that "I was not even paying attention to his hands, to be honest with you." *Id.* at 47:21–48:3. Thomas also clarified: "I could not see. That does not mean he has no gun, but I don't know that." *Id.* at 106:5–20.

### 7. Witness Pierre Dacunha

Pierre Dacunha ("Dacunha") was visiting his in-laws, who live on Feller Avenue, the day of the incident. Chow Decl., Ex. C ("Dacunha Dep.") at 17:24–18:3. Dacunha testified that he observed an officer standing behind a truck across the street and to Cacunha's left. *Id.* at 19:16–20:8. Dacunha overheard this officer talking to someone across the street and testified that the officer said something to the effect of: "We can talk about this. Put your gun down. Everything will be okay. We can talk about it. We can work all this out." *Id.* at 21:12–19. Dacunha estimated he heard the officer talking for twenty minutes. *Id.* at 21:23–22:3.

Dacunha then went back inside the house because more officers had showed up and some had their guns drawn. *Id.* at 22:12–18. Once inside the house, Dacunha "want[s] to say [he] recall[s] the officer again asking this person to be calm and put the weapon down or the gun down, they could talk about it." *Id.* at 22:21–25.

### 8. Security Camera Footage and Cell Phone Videos

In support of their briefing on the instant motion, the parties submitted footage[6] from two security cameras that were mounted on a house across the street from Nunez's residence. *See* ECF No. 66-2 ("Martinez Decl."), Exs. A & B; Buelna Decl., Exs. 11–13.[7] The parties also attached two cell phone videos that were recorded by Nunez's neighbor on the day of the incident.

---

[6] Defendants also cite in support of their motion for summary judgment the declaration of their expert, Jeffrey Flower ("Flower"), and a copy of the security camera footage that Flower enhanced and enlarged. *See* ECF No. 66-3 ("Flower Decl."), Ex. A; *see also* Buelna Decl., Ex. 15. ("Flower Rpt"). Plaintiffs object to this evidence. Opp'n at 8 n. 2. The Court does not rely on Flower's declaration or the enhanced footage in the instant Order. Therefore, the Court DENIES AS MOOT Plaintiffs' challenge to Flower.

[7] Plaintiffs attach to their opposition to the instant motion for summary judgment an expert report from Jason Fries ("Fries") regarding the security camera footage. Buelna Decl., Ex. 14 ("Fries Rpt"); Chow Decl., Ex. L ("Fries Dep.") at 91:19–92:10. Defendants object to Fries's report and argue that the report is inadmissible. *See* Reply at 9–10. The Court does not rely on Fries's report in the instant Order. Therefore, the Court DENIES AS MOOT Defendants' challenge to Fries.

11

Martinez Decl., Exs. C & D.

The security camera footage is time-stamped. *See* Martinez Decl., Exs. C & D; Buelna Decl., Exs. 11–13. The security camera footage shows that the July 4, 2016 incident occurred in broad daylight in a residential neighborhood. There are neighboring houses and numerous cars in the driveways and on the street. *See id.* Nunez's residence is the second house to the left from a street corner, which is likely the corner of Feller and Story based on the officer and witnesses' testimony. *See id.* For simplicity, the Court will refer to the corner as the "street corner." The front door of Nunez's residence is almost entirely obscured by a utility pole and a column on the front porch. *See id.* Moreover, given the angle of the security camera on the house across from the Feller residence, the image of Nunez's front door appears very small in the corner of the footage. *See id.* The images in the security camera footage are not crisp; however, persons and their movements can be seen very generally. *See id.*

At 16:45:00–16:49:30, the security camera footage depicts a man—presumably Cervantes—who is followed by a man out of the residence—presumably Nunez—with a slower, uneven gait. *See* Buelna Decl., Ex. 11. It appears that Cervantes is on the phone. *See id.* Cervantes exits the driveway of the Nunez residence and walks down the street to the street corner, and Nunez follows him. *See id.* Cervantes and Nunez then turn around and return inside Nunez's residence. *See id.*

At 17:08:00–17:10:00, a police officer contact team is seen approaching the house from the street corner. Buelna Decl., Ex. 12. The contact team get all the way to the driveway of the Nunez residence and then are seen retreating all the way back to the street corner. *Id.*

At 17:18:45–17:22:15, Officer Dalaison is seen standing beside a Chevrolet Suburban across the street from Nunez's residence with his gun, pointing at the ground, at his right side. Buelna Decl., Ex. 13. Nunez is moving around in the doorway and walks out onto the porch and appears to look around. *See id.* Nunez is too far away, and the image is not crisp enough, to tell what he is otherwise doing. *See id.*

United States District Court
Northern District of California

At 17:23:55–17:24:05, Nunez reappears on the porch, but the image is very grainy, and Nunez is obscured by a utility pole and the porch column. Nunez then falls to the ground. *See id.* The timing from when Nunez reappears on the porch to when he falls to the ground is approximately ten seconds. *See id.*

The two cell phone videos do not contain relevant images; however, they do contain audio, and someone can be heard saying in the videos something to the effect of: "put the gun down" and "throw it out the front." *See* Martinez Decl., Exs. C & D. Sergeant Raul Martinez ("Sgt. Martinez") declared in his declaration in support of Defendants' motion for summary judgment that he has worked with Officer Dalaison for 20 years and recognizes the cell phone videos to contain the voice of Officer Dalaison communicating with Nunez. Martinez Decl. ¶ 7.

### 9. After Shooting

After the shooting, officers on the scene formed an arrest team which approached and handcuffed Nunez and assessed Nunez's conditions. Joseph Dep. at 62:17–63:16; Chow Decl., Ex. H ("Stults Dep.") at 27:3–28:18. The arrest team found a gun a few feet from Nunez's body. Joseph Dep. at 65:12–24; Stults Dep. at 27:3–28:18; *see also* Buelna Decl., Ex. 9 (photo of Nunez's body and the gun).

After determining there were no other threats, the officers brought in fire and paramedics, and the paramedics confirmed that Nunez was deceased. Joseph Dep. at 62:17–63:16, 68:10–69:2. Lt. Joseph, who was in command after the shooting, had the shooting officers sequestered and transported by a supervisor to the department to be interviewed. Joseph Dep. at 69:3–70:16.

The coroner's report noted that Nunez had evidence of firearm injury to his head, chest, and back. *See* Coroner's Report.

### B. Procedural History

Plaintiffs filed the original complaint in this action on July 7, 2017. ECF No. 1. On January 2, 2018, Plaintiffs filed an amended complaint. ECF No. 14 ("FAC"). On January 18, 2018, Defendants City of San Jose, Officer Santos, and Officer Vizzusi each filed an answer to the

13

amended complaint. *See* ECF Nos. 29, 30, & 31.

On March 7, 2019, Defendants filed the instant motion for summary judgment. *See* Mot. On March 21, 2019, Plaintiffs filed an opposition. ECF No. 69 ("Opp'n"). On March 28, 2019, Defendants replied. ECF No. 72 ("Reply").

## II.     LEGAL STANDARD

Summary judgment is proper where the pleadings, discovery, and affidavits show that there is "no genuine dispute as to any material fact and [that] the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those which may affect the outcome of the case. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *See id.*

The party moving for summary judgment bears the initial burden of identifying those portions of the pleadings, discovery and affidavits that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party meets its initial burden, the nonmoving party must go beyond the pleadings and, by its own affidavits or discovery, "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). If the nonmoving party fails to make this showing, "the moving party is entitled to judgment as a matter of law." *Celotex Corp.*, 477 U.S. at 323.

At the summary judgment stage, the Court must view the evidence in the light most favorable to the nonmoving party: if evidence produced by the moving party conflicts with evidence produced by the nonmoving party, the judge must assume the truth of the evidence set forth by the nonmoving party with respect to that fact. *See Leslie v. Grupo ICA*, 198 F.3d 1152, 1158 (9th Cir. 1999).

Additionally, when, as here, there is videotape evidence of the incident in question, the Court at summary judgment must view "the facts in the light depicted by the videotape." *Scott v. Harri*s, 550 U.S. 372, 381 (2007).

United States District Court
Northern District of California

## III. DISCUSSION

Plaintiffs assert the following five claims against Defendants: (1) 4th Amendment Violation– Excessive Force (42 U.S.C. § 1983); (2) 4th Amendment Violation– Denial of Medical Care (42 U.S.C. § 1983); (3) 14th Amendment Violation– Right to Familial Relationship (42 U.S.C. § 1983); (4) *Monell*– Municipal Liability for Unconstitutional Custom or Policy (42 U.S.C. § 1983); (5) Wrongful Death– Negligence (California C.C.P. Sections 377.60 and 377.61). *See* FAC. The Court addresses each claim in turn.

### A. Excessive Force Claim

Plaintiffs' § 1983 excessive force claim alleges that Officers Santos and Vizzusi violated Nunez's Fourth Amendment rights by unlawfully using deadly force against Nunez. FAC ¶¶ 41–46. Defendants argue that summary judgment is appropriate on Plaintiffs' excessive force claim because the officers used objectively reasonable force and therefore did not violate the Fourth Amendment, and because the officers are entitled to qualified immunity.

Both parties agree that whether Officers Santos and Vizzusi used objectively reasonable force is addressed within the first part of the qualified immunity analysis. Mot. at 12; Opp'n at 17. Therefore, the Court turns to the qualified immunity analysis.

### 1. Legal Standard for Qualified Immunity

"The doctrine of qualified immunity shields officials from civil liability so long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (per curiam). Qualified immunity "gives government officials breathing room to make reasonable but mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law." *City & County of San Francisco v. Sheehan*, 135 S. Ct. 1765, 1774 (2015) (internal quotation marks and brackets omitted). The qualified immunity analysis "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Mendez v. County of Los Angeles*, 815 F.3d 1178, 1186 (9th Cir. 2016) (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)), *overruled on other grounds by County of Los Angeles v. Mendez*, 137 S. Ct. 1539 (2017). "To determine

15

whether an officer is entitled to qualified immunity, [the Court] ask[s], in the order [it] choose[s], (1) whether the alleged misconduct violated a [constitutional] right and (2) whether the right was clearly established at the time of the alleged misconduct." *Hernandez v. City of San Jose*, 897 F.3d 1125, 1132 (9th Cir. 2018) (quoting *Maxwell v. County of San Diego*, 708 F.3d 1075, 1082 (9th Cir. 2013)) (alterations in *Hernandez*); *see also Pearson v. Callahan*, 555 U.S. 223, 232 (2009) (same). Qualified immunity applies unless the answer to both questions is "yes." *See Pearson*, 555 U.S. at 232.

### 2. Whether There Has Been a Violation of a Constitutional Right

Whether the alleged misconduct violated a constitutional right depends on whether or not the officers' use of force against Nunez was objectively reasonable. The Court discusses use of force law then the officers' use of force in the instant case.

#### a. Law on Use of Force

The Fourth Amendment permits law enforcement to use "objectively reasonable" force. *Graham v. Connor*, 490 U.S. 386, 396–97 (1989). Such an inquiry requires the Court to "consider the totality of the circumstances." *Gonzalez v. City of Anaheim*, 747 F.3d 789, 794 (9th Cir. 2014) (en banc) (citation omitted). "Factors for evaluating reasonableness include, but are not limited to: (1) the severity of the crime at issue; (2) whether the suspect posed an immediate threat to the safety of the officers or others; and (3) whether the suspect actively resisted arrest or attempted to escape." *S.B. v. County of San Diego*, 864 F.3d 1010, 1013 (9th Cir. 2017) (citing *Graham*, 490 U.S. at 396). "Other relevant factors include the availability of less intrusive alternatives to the force employed, whether proper warnings were given and whether it should have been apparent to officers that the person they used force against was emotionally disturbed." *Id.* (quoting *Glenn v. Washington County*, 673 F.3d 864, 872 (9th Cir. 2011)).

"Of all these factors, the 'most important' one is 'whether the suspect posed an immediate threat to the safety of the officers or others.'" *Id.* (quoting *George v. Morris*, 736 F.3d 829, 838 (9th Cir. 2013)). "An officer's use of deadly force is reasonable only if the officer has probable

16

cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others." *Gonzalez*, 747 F.3d at 793 (quoting *Scott v. Henrich*, 39 F.3d 912, 914 (9th Cir. 1994)). "With respect to the possibility of less intrusive force, officers need not employ the least intrusive means available[,] so long as they act within a range of reasonable conduct." *Estate of Lopez ex rel. Lopez v. Gelhaus*, 871 F.3d 998, 1006 (9th Cir. 2017) (quoting *Hughes v. Kisela*, 841 F.3d 1081, 1085 (9th Cir. 2016), *overruled on other grounds by Kisela v. Hughes*, 138 S. Ct. 1148 (2018)).

Below, the Court addresses the four reasonableness factors set forth in *S.B.*

### b. Analysis of Reasonableness Factors

The parties do not dispute the first and third reasonableness factors: severity of the crime and whether Nunez actively resisted arrest or attempted to escape. Specifically, the parties do not dispute that Nunez was suicidal, had not committed a crime at the time he was shot, and that he was not actively resisting arrest or attempting to evade arrest by flight. *See* Mot; Reply; *see also George*, 736 F.3d at 837–38 (recounting that district court found that the first and third factor unmistakably weighed in the plaintiff's favor where the decedent, a suicidal sixty-five-year-old man with terminal brain cancer, walked onto his balcony with a walker in one hand and a gun in the other).

Instead, the parties dispute the second and fourth reasonableness factors: whether Nunez posed an immediate threat to the safety of the officers or others and "other relevant factors." The Court addresses each in turn.

#### i. Whether Nunez Posed an Immediate Threat

"Law enforcement officials may not kill suspects who do not pose an immediate threat to their safety or to the safety of others simply because they are armed." *Harris v. Roderick*, 126 F.3d 1189, 1204 (9th Cir. 1997). However, "where a suspect threatens an officer with a weapon such as a gun or a knife, the officer is justified in using deadly force." *Smith v. City of Hemet*, 394 F.3d 689, 704 (9th Cir. 2005) (collecting cases); *see also George*, 736 F.3d at 838 ("When an

Case No. 17-CV-03860-LHK
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

individual points his gun 'in the officers' direction,' the Constitution undoubtedly entitles the officer to respond with deadly force." (quoting *Long v. City & County of Honolulu*, 511 F.3d 901, 906 (9th Cir. 2007))). "If the person is armed—or reasonably suspected of being armed—a furtive movement, harrowing gesture, or serious verbal threat might create an immediate threat." *George*, 736 F.3d at 838. Thus, "[t]he key issue . . . is whether a reasonable jury would necessarily find that [an officer] perceived an immediate threat of death or serious physical injury at the time" the officer used deadly force. *Gonzalez*, 747 F.3d at 794. "All determinations of unreasonable force 'must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.'" *Henrich*, 39 F.3d at 914 (quoting *Graham*, 490 U.S. at 396–97).

Plaintiffs argue that neighbor Charles Thomas's deposition testimony, the inconsistencies among the officers' testimonies, and the picture of the gun next to Nunez's body create a genuine dispute of material fact as to whether Nunez had a gun and pointed it at the officers. Opp'n at 9–14. If Nunez did not have a gun and did not point the gun at the officers, then Nunez did not pose an immediate threat to the officers' safety or to the safety of others, and the officers were not justified in using deadly force. The Court considers each of Plaintiffs' arguments in turn.

### (a) Neighbor Charles Thomas's Testimony

Nunez was shot the second time Nunez was on the porch. At his deposition, neighbor Thomas was asked the following question about the second time Nunez was on the porch: "when you saw [Nunez] come out, did he have anything in his hands?" Thomas Dep. at 46:3–23. Thomas responded "No." *Id.* Thomas clarified that his view of Nunez's hands was blocked because Nunez's hands were down by his side, but if Nunez had raised his hands up, then Thomas would have been able to see Nunez's hands, but Thomas did not. *Id.* at 46:1–49:11, 90:23–91:11. Specifically, the deposition testimony was as follows:

> MS. CHOW: For the record, Mr. Thomas's hands, when he was making the explanation, his hands were down by his side at one point.

18

MR. BURRIS: Right.

MS. CHOW: And then you raised your hands up to around waist level.

THE WITNESS: No, no, no. I said I would have seen it.

MS. CHOW: You would have seen it if his hands were up—

THE WITNESS: Yes, if he something — exactly, if something in his hand. If something like this, I cannot see —.

Thomas at 46:13–47:25. Thomas testified that he did not see Nunez raise either hand prior to being shot. *Id.* at 46:1–49:11, 90:23–91:11; *see also id.* at 56:2–9. Thomas testified that he did not see Nunez twirl a gun or raise his hands and that Nunez's arms were down by his side the entire time Thomas saw him. *Id.* at 104:25–108:14.

Taking Thomas's testimony as true, even the Defendants' own Police Practices Expert, Scott Seaman, testified at his deposition that: "If Mr. Nunez did not raise his hand as Mr. Thomas said, I would also draw the conclusion that he did not twirl the gun in his hand and that he did not stop and hold the gun in a deliberate or intentional movement pointing it in the direction of the officers. If that is the case, I don't think that rises to the same level of imminent threat as the set of facts where it's alleged that Mr. Nunez did twirl the gun and then make those movements." Buelna Decl., Ex. 8 ("Seaman Dep.") at 78:10–79:11.

Defendants assert that Thomas's testimony does not create a genuine dispute of material fact because Thomas also testified as follows: "I was not even paying attention to his hands, to be honest with you" and that "I could not see. That does not mean he has no gun, but I don't know that." Reply at 3 (citing Thomas Dep. at 47:21–48:3, 106:15–20); Mot. at 10 n.2 (citing Thomas Dep. at 106:15–20).

Moreover, at the time of the shooting, Thomas was inside his house and talking on the phone with a neighbor who was in Mexico, and the shooting happened within seconds after Nunez appeared on the porch a second time. Reply at 3–4.

Although the testimony from Thomas cited by Defendants undermines Plaintiffs' claim,

United States District Court
Northern District of California

the Court cannot make a credibility determination or weigh the evidence at summary judgment. *House v. Bell*, 547 U.S. 518, 559–60 (2006) (At the summary judgment stage, the Court "does not assess credibility or weigh the evidence, but simply determines whether there is a genuine factual issue for trial.").

Moreover, at the summary judgment stage, the Court must view the evidence in the light most favorable to the nonmoving party and if evidence produced by the moving party conflicts with evidence produced by the nonmoving party, the judge must assume the truth of the evidence set forth by the nonmoving party with respect to that fact. *See Leslie*, 198 F.3d at 1158. Taking Thomas's deposition testimony as true, Officers Santos and Vizzusi shot Nunez when Nunez's hands were at Nunez's side without a gun, in which case Nunez did not pose an immediate threat.

### (b) Inconsistencies in Officers' Testimony

Plaintiffs cite three inconsistencies in the officers' testimony regarding the second time Nunez was on the porch: (1) Officers Santos, Vizzusi, and Dalaison testified that Nunez came out of the house with the gun already in his hand, but Officer Raghavan testified that Nunez pulled the gun from his waistband; (2) Officers Santos, Vizzusi, and Raghavan testified that Nunez twirled the gun, but Officer Dalaison testified that he never saw Nunez twirl the gun; and (3) Officers Santos, Vizzusi, and Raghavan testified that Nunez pointed the gun at the officers, but Officer Dalaison provided no such testimony.

As an initial matter, the Court notes that the security camera footage is inconclusive as to what Nunez did when Nunez was on the porch the second time because Nunez is too far away to tell if there is anything in his hands, and he is obscured by a utility pole and the porch column. *See* Buelna Decl., Ex. 13.

Each specific officer's testimony is as follows. Officer Vizzusi testified that when he saw Nunez come back onto the porch the second time, Nunez "was twirling the gun around in his finger." Vizzusi Dep. at 64:9–12, 91:2–94:7. Officer Vizzusi also testified that Nunez "end[ed] up raising the firearm—twirling the firearm and then raising it" to about the level of his sternum.

20

Vizzusi Dep. at 64:9–12, 91:2–94:7. Officer Vizzusi further testified: "it appeared that he was twirling the gun in front of him, and at one point he stop[ped] and he started to lift his gun—you know, lift his hand higher than where he was twirling it." *Id.* at 92:22–25. "At the point that—just about the point when he stopped twirling the gun and he started to lift the gun in our direction, I fired." *Id.* at 93:7–9.

Officer Santos testified that the second time Nunez was on the porch Nunez "had the gun in his right hand and he was twirling it on his index finger." Santos Dep. at 72:16–77:24. Officer Santos testified he observed Nunez twirl the gun approximately three times and then "stop[ ] and very deliberately point[ ]" the gun in the direction of the officers to the northwest. *Id.* at 75:5–25.

Officer Raghavan testified that when Nunez "walked out onto the porch he didn't have anything in his hands." Raghavan Dep. at 45:8–47:2. Officer Raghavan testified that once Nunez was on the porch, he saw Nunez reach into his side waistband, pull out a gun, and twirl it forward and back. *Id.* Officer Raghavan also testified that he saw Nunez grab the handle of the gun and point it in the direction of the officers. *Id.* at 45:5–57:9.

Officer Dalaison testified that when Nunez came onto the porch the second time, he "saw the gun still in [Nunez's] hand." Dalaison Dep. at 73:4–75:15. However, Officer Dalaison did not testify that he saw Nunez point a gun at the officers. Instead, after he saw Nunez on the porch a second time, Officer Dalaison repositioned himself to join Vizzusi. Officer Dalaison testified that he did not see Nunez twirling the gun in his finger. *Id.* at 78:23–24. Officer Dalaison testified that the last thing he saw as he turned was that Nunez was moving forward with the gun in his right hand at or above the waistline, with his arm bent. *Id.* at 75:2–7. However, with the exception of mentioning that the gun was in Nunez's right hand, Officer Dalaison did not include any of this information about the position of the gun in the police report that Officer Dalaison wrote on July 4, 2016. *See* Dalaison Police Rpt. As he relocated, Officer Dalaison heard two, almost simultaneous shots. *Id.* at 73:23–74:7, 77:6–25, 78:11–80:4.

Defendants argue that any inconsistencies among the officers' testimony are not material.

United States District Court
Northern District of California

Reply at 4–5. Specifically, Defendants argue that "Officers Dalaison's and Raghavan's testimony is not relevant and does not dispute what Officers Santos and Vizzusi saw and reacted to immediately before they fired" and that "[t]here is no testimony that Santos or Vizzusi shot Nunez because he was twirling the gun." *Id.*

The Court disagrees. Whether Nunez pointed a gun at the officers is highly material. Moreover, the other two inconsistencies are material because they bear on the officers' credibility regarding whether Nunez had a gun and pointed it at the officers.

### (c) Photograph of Nunez's Body with the Gun

Moreover, Plaintiffs cite the photograph showing the gun a few feet from Nunez's body as evidence that Nunez may have already thrown the gun down before he was shot. Opp'n at 14 (citing Buelna Decl., Ex. 9 (photo of Nunez's body and the gun)). Defendants contend that Plaintiffs' argument that Nunez may have thrown the gun down is only speculation based on a photograph and that Plaintiffs do not cite any testimony that Nunez threw the gun down. Reply at 4. However, on summary judgment, the Court must view the evidence in the light most favorable to the nonmoving party, *see Leslie*, 198 F.3d at 1158, and the photograph is material to whether Nunez had a gun when shot.

### (d) Totality of Evidence

Thomas's testimony, the inconsistencies among the officers' testimonies, and the picture of the gun next to Nunez's body raise a genuine dispute of material fact as to whether Nunez had a gun and whether Nunez pointed the gun at the officers. "When an individual points his gun 'in the officers' direction,' the Constitution undoubtedly entitles the officer to respond with deadly force." *George*, 736 F.3d at 838 (quoting *Long*, 511 F.3d at 906). However, "[l]aw enforcement officials may not kill suspects who do not pose an immediate threat to their safety or to the safety of others simply because they are armed." *Harris*, 126 F.3d at 1204. The totality of the evidence here raises a genuine dispute of material fact as to whether Nunez posed an immediate threat.

### ii. Other Relevant Factors

22

As to the final reasonableness factor, "other relevant factors," Plaintiffs argue that Officers Santos and Vizzusi should have first pursued non-lethal options, such as providing a warning that they would shoot if Nunez did not drop the gun. Opp'n at 14–16. Under the Fourth Amendment, "[o]fficers need not avail themselves of the least intrusive means of responding to an exigent situation; they need only act within that range of conduct [the courts have identified] as reasonable." *Glenn*, 673 F.3d at 876 (internal quotation and citation omitted). In that regard, an officer must "consider what other tactics if any were available," and only "if there were clear, reasonable and less intrusive alternatives to the force employed," does this factor weigh "against finding the use of force reasonable." *See id.* (internal quotation and citation omitted). Moreover, "whenever practicable, a warning must be given before deadly force is employed." *Harris*, 126 F.3d at 1201.

Although there is no evidence in the record that any officer warned that they would shoot Nunez if he did not drop the gun, the Court notes that Officer Dalaison testified that he provided warnings when Nunez was on the porch the first and second time. As to the first time, Officer Dalaison testified that he asked Nunez to put the gun down and come out to get medical attention. Dalaison Dep. at 64:13–17, 66:23–67:16. As to the second time, Officer Dalaison testified that when Nunez came onto the porch, Officer Dalaison yelled "[p]ut the gun down" before quickly repositioning himself by Officer Vizzusi. Dalaison Dep. at 73:12–75:15.

The cell phone videos and neighbor Dacunha's testimony corroborate that someone told Nunez to put the gun down. Sgt. Martinez declared that he has worked with Officer Dalaison for 20 years and recognizes the voice communicating with Nunez on the cell phone videos to be the voice of Officer Dalaison. Martinez Decl. ¶ 7. Plaintiffs do not dispute that the voice on the cell phone videos belongs to Officer Dalaison.

However, it is unclear from the cell phone videos and Dacunha's testimony whether Officer Dalaison's statements were made when Nunez was on the porch the first or second time. *See also* Martinez Decl., Exs. C & D (cell phone videos containing audio, including someone

23

saying, "put the gun down" and "throw it out the front."); Dacunha Dep. at 21:12–19 (testifying at his deposition that he heard an officer state something to the effect of: "We can talk about this. Put your gun down. Everything will be okay. We can talk about it. We can work all this out.").

Defendants argue that the officers were not required to give a warning when confronted with an immediate threat and that Plaintiffs' insistence that the officers should have warned that they would shoot appears to contradict the Peace Officer Standards and Training ("POST") requirements for dealing with mentally impaired and suicidal subjects. Reply at 6 (citing FAC ¶ 25). Plaintiffs' amended complaint cites the POST requirements, including that "POST trains police officers, 'do not threaten the individual with arrest or in any other manner,' explaining that 'threats may create additional fight, stress, or potential aggression.'" FAC ¶ 25.

Further, because there is a genuine dispute of material fact as to whether there was an immediate threat, there is also a genuine dispute of material fact as to whether it would have been practicable for officers to give Plaintiffs' requested warning before Officers Santos and Vizzusi shot Nunez. *See, e.g.*, *Harris*, 126 F.3d at 1203–04 (finding that an FBI agent used excessive force when he shot a suspect who had made no threatening movements without warning).

### iii. Conclusion as to Reasonableness of Use of Force

Based on the totality of the circumstances, the Court concludes that there is a genuine dispute of material fact as to whether Officers Santos and Vizzusi used deadly force in response to what a reasonable officer would have perceived as an immediate threat of death or serious physical injury. As a result, there is a genuine dispute of material fact as to whether Officers Santos and Vizzusi's use of deadly force was objectively reasonable, and in turn, whether their use of force violated Nunez's Fourth Amendment rights as a matter of law. *Graham*, 490 U.S. at 396–97.

The cases cited by Defendants are inapposite because the facts in those cases were undisputed. *See, e.g.*, *Gonzales v. City of Antioch*, 697 F. App'x 900, 901–02 (9th Cir. 2017) ("Here, it is undisputed that the responding officers were confronted with a suspect who had

24

repeatedly threatened to kill a police officer and raised his gun in the direction of the officers. Gonzales' actions rendered the officers' use of force reasonable as a matter of law."); *Ramirez v. Knoulton*, 542 F.3d 124, 128 (5th Cir. 2008) (finding that the parties did not dispute the facts and that the only question was whether the officer acted reasonably); *Elliott v. Leavitt*, 99 F.3d 640, 645 (4th Cir. 1996) ("The other facts referenced by appellees are not controverted and do not alter the inescapable conclusion that the officers were confronted with a serious threat to their safety."); *Conlogue v. Hamilton*, 906 F.3d 150, 156 (1st Cir. 2018) ("In the case at hand, the undisputed facts make it abundantly clear both that it was reasonable for Hamilton to believe that Conlogue was an imminent threat to others and that he was repeatedly warned to drop his weapon.").

Having found a genuine dispute of material fact as to the first question in the qualified immunity analysis, the Court now turns to the second question in the qualified immunity analysis.

### 3. Whether the Right was Clearly Established at the Time of the Alleged Misconduct

As for the second question in the qualified immunity analysis, officers are entitled to qualified immunity where their conduct did not "violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson*, 555 U.S. at 231 (citation omitted). For a constitutional right to be clearly established, it must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. *Mullenix*, 136 S. Ct. at 308. To do so, the "existing precedent must have placed the statutory or constitutional question beyond debate." *Id.* (quotation added).

In their briefing, Plaintiffs argue that it was clearly established at the time Nunez was shot that it is unconstitutional to shoot an unarmed person and that an officer must "whenever practicable" give a warning before using deadly force. Opp'n 18 (citing *Gonzalez*, 747 F.3d at 797; *Tennessee v. Garner*, 471 U.S. 1, 11 (1985) ("A police officer may not seize an unarmed, nondangerous suspect by shooting him dead.")). In the alternative, Plaintiffs argue that Defendants are not entitled to qualified immunity because it was clearly established at the time Nunez was shot that it is unconstitutional to shoot a person when the person is merely holding a gun. Opp'n at

United States District Court
Northern District of California

18–20. In support, Plaintiffs cite, among other cases, *Wilkinson v. Torres*, where the Ninth Circuit explained that *Garner* clearly established "that an officer may not use deadly force to apprehend a suspect *where the suspect poses no immediate threat to the officer or others*." 610 F.3d 546, 554 (9th Cir. 2010) (emphasis added).

Defendants, by contrast, argue that there is no law prohibiting officers from using deadly force when faced with "an individual aiming a gun in their direction." Reply at 5. Defendants also argue that verbal warnings are only required where feasible. Reply at 5–6 (citing *Garner*, 471 U.S. at 11–12).

Here, the Court cannot resolve the parties' dispute as to whether Officers Santos and Vizzusi's conduct violated clearly established statutory or constitutional rights of which a reasonable person would have known. This is because both parties' arguments depend on whether or not Nunez had a gun and pointed it at the officers at the time he was shot, and the Court has already found a genuine material dispute as to those facts. Accordingly, the Court concludes there is a genuine material dispute as to this second question in the qualified immunity analysis.

### 4. Qualified Immunity Summary

In sum, the Court finds there is a genuine dispute of material fact as to whether Officers Santos and Vizzusi's use of deadly force violated Nunez's Fourth Amendment rights as a matter of law and whether Officers Santos and Vizzusi's conduct violated clearly established statutory or constitutional rights of which a reasonable person would have known. Thus, at summary judgment, the Court cannot conclude that Officers Santos and Vizzusi are entitled to qualified immunity. Accordingly, the Court DENIES Defendants' motion for summary judgment as to the § 1983 claim for excessive force.

### B. Denial of Medical Care Claim

Plaintiffs' § 1983 denial of medical care claim alleges that the denial of medical care by Officers Santos and Vizzusi deprived Nunez of his Fourth Amendment rights. FAC ¶¶ 47–52. Defendants argue that summary judgment is appropriate on Plaintiffs' § 1983 denial of medical

26

care claim because there is no evidence that either Officer Vizzusi or Officer Santos had any role in getting medical care to Nunez. Mot. at 13–14. Specifically, Defendants emphasize that both Officers Santos and Vizzusi were sequestered after they shot Nunez and that they did not have responsibility for and did not make any decision related to providing medical care to Nunez. Therefore, Defendants argue that there is no factual basis to hold Officers Santos or Vizzusi liable for this alleged constitutional violation. *Id.* The Court finds that Defendants have met their burden of identifying the portions of pleadings, discovery and affidavits that demonstrate the absence of a genuine issue of material fact. *Celotex Corp.*, 477 U.S. at 323.

Plaintiffs provide no opposition to Defendants' motion for summary judgment on this claim. *See* Opp'n; *id.* at 25 (requesting *only* that the Court deny Defendants' summary judgment motion on Plaintiffs' federal claims for excessive force, familial loss, and state wrongful death claim); *see also* Reply at 7. Because Plaintiffs fail to set forth *any* "specific facts showing that there is a genuine issue for trial," Fed. R. Civ. P. 56(e), Defendants, as "the moving party[,] [are] entitled to judgment as a matter of law." *Celotex Corp.*, 477 U.S. at 323. Accordingly, the Court GRANTS Defendants' motion for summary judgment on Plaintiffs' § 1983 denial of medical care claim.

## C. Right to Familial Relationship Claim

Plaintiffs' § 1983 right to familial relationship claim alleges that as a result of the excessive force by Officers Santos and Vizzusi, Nunez died, and Nunez's father, Plaintiff Tony Nunez, was deprived of his 14th Amendment constitutional right of a familial relationship with Nunez. FAC ¶¶ 53–61. Defendants argue that summary judgment is appropriate on Plaintiffs' § 1983 right to familial relationship claim.

For Plaintiffs' 14th Amendment claim to survive summary judgment, there must be a genuine dispute of material fact as to whether the officers engaged in conduct that "shocks the conscience." *Porter v. Osborn*, 546 F.3d 1131, 1137 (9th Cir. 2008) ("[O]nly official conduct that 'shocks the conscience' is cognizable as a due process violation" (citation omitted)). The first

27

consideration is "whether the circumstances are such that 'actual deliberation is practical.'" *Moreland v. Las Vegas Metro. Police Dep't*, 159 F.3d 365, 372 (9th Cir. 1998) (citation omitted). "Where actual deliberation is practical, then an officer's 'deliberate indifference' may suffice to shock the conscience." *Wilkinson*, 610 F.3d at 554 (citing *Moreland*, 159 F.3d at 372). If the officers "did not have time to deliberate, a use of force shocks the conscience only if the officers had a 'purpose to harm' the decedent for reasons unrelated to legitimate law enforcement objections." *Gonzalez*, 747 F.3d at 797 (citing *Porter*, 546 F.3d at 1137). There is no time for actual deliberation, for example, when "a law enforcement officer makes a snap judgment because of an escalating situation." *Wilkinson*, 610 F.3d at 554.

Here, the parties dispute whether the officers had time for actual deliberation. *See* Mot. at 14; Opp'n at 21. Plaintiffs' actual deliberation argument for Plaintiffs' 14th Amendment right to familial relationship claim overlaps with Plaintiffs' excessive force claim. *See* Opp'n at 21 ("[M]any of the same factual disputes that affect the Fourth Amendment claim weigh against summary judgment on Plaintiff's Fourteenth Amendment claim."). Specifically, Plaintiffs argue that Thomas's testimony and the officers' putative failure to give a warning before shooting constitute possible evidence of time for actual deliberation. *See id.* ("If Mr. Thomas'[s] testimony is found credible, a reasonable jury could find that there was ample time for the officers to deliberate before shooting."). Defendants respond that "Nunez pointed a gun at officers, giving them no time to deliberate, so the correct standard is whether Defendants Santos and Vizzusi 'acted with a purpose to harm unrelated to legitimate law enforcement objectives.'" Opp'n at 8 (citing *Hayes v. Cty. of San Diego*, 736 F.3d 1223, 1230 (9th Cir. 2013)).

For the reasons discussed with regards to Plaintiffs' § 1983 excessive force claim, the Court finds a genuine dispute of material fact as to whether or not Nunez had a gun and pointed it at the officers. There is therefore also a genuine material dispute as to whether Officers Santos and Vizzusi had time for actual deliberation. Specifically, if Nunez did not pose an immediate threat to the officers, then a reasonable jury could find that Officers Santos and Vizzusi had actual time to

deliberate before shooting. Because there is a genuine dispute of material fact as to whether there was time for actual deliberation, the Court need not consider whether Officers Santos and Vizzusi had a "purpose to harm," because that issue is only reached if the officers "did not have time to deliberate." *Gonzalez*, 747 F.3d at 797 (citing *Porter*, 546 F.3d at 1137).

Accordingly, the Court DENIES Defendants' motion for summary judgment on Plaintiffs' 14th Amendment right to familial relationship claim.

### D. *Monell* Claim

Plaintiffs also allege that the Defendant City of San Jose is liable under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), based on: (1) a failure to hire, train, and supervise properly; (2) ratification/failure to discipline; (3) an unconstitutional custom, practice, or policy; and (4) a failure to investigate. FAC ¶¶ 62–72.

Defendants argue there is no evidence of inadequate hiring, training, and supervision because Plaintiffs cite no evidence regarding the City of San Jose's hiring practices or that they were deficient; there is no evidence of any prior excessive force complaints made against the Officers Santos or Vizzusi, and this is the first time either Officer Santos or Officer Vizzusi had shot someone; both officers went through a police academy, are POST-certified, and received rifle training. Mot. at 16–17. Defendants argue there is no evidence of ratification or failure to discipline because there is no evidence that any final policymaker affirmatively approved of the Defendants officers' actions. *Id.* at 17–18. Defendants also argue there is no evidence that the actions of Officers Santos and Vizzusi reflect any improper policy or practice, and that to the contrary, Officer Vizzusi testified that pursuant to SJPD policy, he would only be allowed to use deadline force in self-defense or in defense of another person's life. *Id.* at 18 (citing Vizzusi Dep. at 101:20–102:25). Finally, Defendants argue there is no evidence of a failure to investigate because the SJPD Homicide Unit conducted an extensive investigation pursuant to the Department's Officer Involved Shooting Policy and presented that evidence to the Santa Clara County District Attorney's office for review, after which the office issued a 56-page report. Mot.

29

at 18. The Court finds that Defendants have met their burden of identifying the portions of pleadings, discovery and affidavits that demonstrate the absence of a genuine issue of material fact. *Celotex Corp.*, 477 U.S. at 323.

Plaintiffs provide no opposition to Defendants' motion for summary judgment on their *Monell* claim. *See* Opp'n; *id.* at 25 (requesting *only* that the Court deny Defendants' summary judgment motion on Plaintiffs' federal claims for excessive force, familial loss, and state wrongful death claim); *see also* Reply at 7. Therefore, because Plaintiffs fail to set forth *any* "specific facts showing that there is a genuine issue for trial," Fed. R. Civ. P. 56(e), Defendants, as "the moving party[,] [are] entitled to judgment as a matter of law." *Celotex Corp.*, 477 U.S. at 323. The Court thus GRANTS Defendants' motion for summary judgment on the *Monell* claim.

### E. Wrongful Death Negligence Claim

Plaintiffs assert a wrongful death negligence claim against Officers Santos and Vizzusi and, vicariously, the City of San Jose. FAC ¶¶ 53–61. Under California law, public employees "are statutorily liable to the same extent as private persons for injuries caused by their acts or omissions, subject to the same defenses available to private persons." *Hayes v. County of San Diego*, 305 P.3d 252, 255 (Cal. 2013). In addition, "public entities are generally liable for injuries caused by the negligence of their employees acting within the scope of their employment." *Hayes*, 305 P.3d at 255.

"[I]n order to prove facts sufficient to support a finding of negligence, a plaintiff must show that [the] defendant had a duty to use due care, that he breached that duty, and that the breach was the proximate or legal cause of the resulting injury." *Hayes*, 305 P.3d at 255 (quoting *Nally v. Grace Community Church*, 763 P.2d 948 (Cal. 1988)) (alterations in *Hayes*). "In California, police officers 'have a duty to act reasonably when using deadly force.'" *Vos v. City of Newport Beach*, 892 F.3d 1024, 1037 (9th Cir. 2018) (quoting *Hayes*, 305 P.3d at 256). "To determine police liability, a court applies tort law's 'reasonable care' standard, which is distinct from the Fourth Amendment's 'reasonableness' standard." *Id.* (citing *Hayes*, 305 P.3d at 262).

"The Fourth Amendment is narrower and 'plac[es] less emphasis on preshooting conduct.'" *Id.*
(quoting Hayes, 305 P.3d at 262) (alteration in original); *see also C.V. by & through Villegas v.*
*City of Anaheim*, 823 F.3d 1252, 1257 n.6 (9th Cir. 2016) (noting that "state negligence law . . . is
broader than federal Fourth Amendment law"). Accordingly, under California law, "tactical
conduct and decisions preceding the use of deadly force" may "give[] rise to negligence liability"
if they "show, as part of the totality of circumstances, that the use of deadly force was
unreasonable." *Hayes*, 305 P.3d at 263.

However, "[a]s long as an officer's conduct falls within the range of conduct that is
reasonable under the circumstances, there is no requirement that he or she choose the 'most
reasonable' action or the conduct that is the least likely to cause harm and at the same time the
most likely to result in" success of the officer's objective. *Id.* at 258 (quoting *Brown v.*
*Ransweiler*, 171 Cal. App. 4th 516, 537–38 (2009)) (alteration in *Hayes*). Moreover, like in the
Fourth Amendment context, the reasonableness of a particular use of force under California
negligence law "must be judged from the perspective of a reasonable officer on the scene, rather
than with the 20/20 vision of hindsight." *Id.* (quoting *Graham*, 490 U.S. at 396).

Here, the parties effectively dispute whether or not Officers Santos and Vizzusi's conduct
was objectively reasonable. Opp'n at 24; Reply at 9. Plaintiffs contend first that, for the same
reasons as discussed with the excessive force claim, "Defendants should not have shot Nunez for
merely standing on his porch." Opp'n at 24. Specifically, Plaintiffs argue that Nunez was unarmed
or merely holding a gun and not pointing it at the officers at the time he was shot. Plaintiffs also
argue that a jury could conclude that Officers Santos and Vizzusi acted negligently because they
failed to employ less lethal weapons such as a bean bag gun to disarm Nunez; because Officer
Santos failed to communicate that the first time Nunez appeared on the porch, Nunez raised the
gun towards the "general direction of the officers," Santos Dep. at 65:4–65:16; and because the
officers "heard and affirmed the order for the cousin to place the handgun in the backyard when
they should have had him put it in a place [Nunez] could not retrieve it." Opp'n at 24. Defendants

United States District Court
Northern District of California

counter that the use of deadly force by Defendants Santos and Vizzusi was objectively reasonable, and that there is no evidence that either Officer Santos or Officer Vizzusi's preshooting conduct rendered their use of force negligent. Reply at 9.

The Ninth Circuit has explained that state negligence law is "broader than federal Fourth Amendment law." *See C.V.*, 823 F.3d 1257 n.6 (citing *Hayes*, 57 Cal. 4th 622). Therefore, in *Vos*, because the Ninth Circuit had already determined that "the district court erred in holding that use of deadly force was objectively reasonable under the Fourth Amendment," the Ninth Circuit reversed the district court's "summary adjudication of the Parents' negligence claim." 892 F.3d at 103. Similarly, in *Dorger v. City of Napa*, the court found that because there was a genuine dispute of material fact as to the objective reasonableness of the officers' use of deadly force in the qualified immunity context, summary judgment as to the wrongful death negligence claim must also be denied. 2013 WL 5804544, at *10 (N.D. Cal. Oct. 24, 2013).

Accordingly, because the Court already denied summary judgment on Plaintiffs' § 1983 excessive force claim in the instant Order, the Court must also deny summary judgment as to Plaintiffs' broader wrongful death negligence claim. *See C.V.*, 823 F.3d 1257 n.6 (citing *Hayes*, 57 Cal. 4th 622); *Vos*, 892 F.3d at 103; *Dorger*, 2013 WL 5804544, at *10. Thus, the Court DENIES Defendants' motion for summary judgment as to the wrongful death negligence claim.

## IV.     CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is GRANTED as to the § 1983 denial of medical care claim and the *Monell* claim. Defendants' motion for summary judgment is DENIED as to the § 1983 excessive force claim, the § 1983 right to familial relationship claim, and the wrongful death negligence claim.

**IT IS SO ORDERED.**

Dated: May 23, 2019

*Lucy H. Koh*
_____
LUCY H. KOH
United States District Judge

32