1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| TONY NUNEZ and THE ESTATE OF ANTHONY NUNEZ THROUGH ITS PERSONAL REPRESENTATIVE SANDY SANCHEZ<br><br>Plaintiffs,<br><br>v.<br><br>MICHAEL SANTOS and ANTHONY VIZZUSI, et al.,<br><br>Defendants. | Case No. 17-CV-03860-LHK<br><br>**ORDER DENYING DEFENDANTS' POST-TRIAL MOTIONS**<br><br>Re: Dkt. No. 193 |

A jury trial commenced in this case on June 17, 2019. On June 25, 2019, at the close of

the defense case and prior to closing arguments, Defendants Michael Santos and Anthony Vizzusi

(collectively, "Defendants") moved for judgment as a matter of law pursuant to Federal Rule of

Civil Procedure 50(a). The Court denied the motion and allowed the entire case to go to the jury.

On July 2, 2019, the jury returned a verdict in favor of Plaintiffs as to Plaintiffs' excessive force

and negligence claims, and in favor of Defendants as to Plaintiffs' right to familial relationship

claim.

Following the verdict, Defendants renewed their motion for judgment as a matter of law in

accordance with Federal Rule of Civil Procedure 50(b) and included an alternative motion for a new trial or remittitur under Federal Rule of Civil Procedure 59. These motions are presently before the Court. Having considered the submissions of the parties, the relevant law, and the record in this case, the Court DENIES the motion for judgment as a matter of law and the motion for a new trial or remittitur.

## I. BACKGROUND

This case arises out of an incident on July 4, 2016 in which Anthony Nunez ("Nunez") was fatally shot by two officers of the San Jose Police Department ("SJPD"). The following basic facts were established at trial, and are undisputed. On the afternoon of July 4, 2016, officers of the SJPD responded to a priority service call at 994 Feller Avenue, San Jose, California ("994 Feller Avenue"), for a man with a gun who was possibly suicidal. ECF No. 185 at 48-49. Among the responding officers were Officers Michael Santos ("Officer Santos") and Anthony Vizzusi ("Officer Vizzusi"). *Id.* at 49. Before the police arrived, Nunez shot himself in the head with a gun but was not killed. *Id.* Then, at some point after the police arrived but before they were able to enter the house at 994 Feller Avenue, Nunez stepped out of the house and onto the porch with a gun. ECF No. 197 at 8; ECF No. 193 at 2. Nunez then retreated into the house. ECF No. 197 at 8; ECF No. 193 at 2. Later, Nunez returned to the porch with the gun on or near his person. ECF No. 197 at 8; ECF No. 193 at 2. Defendants Santos and Vizzusi then shot Nunez and killed him. ECF No. 185 at 49.

### A. Procedural History

#### 1. Pre-trial Proceedings

On July 7, 2017, Tony Nunez—the decedent's father—and the Estate of Anthony Nunez by and through its personal representative Sandy Sanchez (collectively, "Plaintiffs") filed suit against the City of San Jose, Officer Santos, Officer Vizzusi, and various Doe SJPD officers. ECF No 1. Plaintiffs amended their complaint on January 12, 2018. ECF No. 14. The First Amended Complaint ("FAC") contains five claims: (1) a claim under 42 U.S.C. § 1983 and the Fourth Amendment to the United States Constitution for excessive force; (2) a claim under 42 U.S.C. §

1983 and the Fourth Amendment to the United States Constitution for denial of medical care; (3) a

claim under 42 U.S.C. § 1983 and the Fourteenth Amendment to the United States Constitution

for violation of his right to familial relationship; (4) a claim under 42 U.S.C. § 1983 for municipal

liability for unconstitutional custom or policy; and (5) a wrongful death claim under California

state law, *see* Cal. Code Civ. P. § 377.60.

Defendants filed a motion for summary judgment as to all claims in the FAC on March 7,

2019. ECF No. 66. The Court granted the motion as to claims (2) and (4) for denial of medical

care and municipal liability, respectively. ECF No. 82 at 32. The Court otherwise denied the

motion for summary judgment. *Id.* In so doing, the Court found there was a genuine dispute of

material fact as to whether Officers Santos and Vizzusi were entitled to qualified immunity for

using deadly force against Nunez. *Id.* at 26.

### 2. Trial

Trial commenced on June 17, 2019. ECF No. 128. At trial, Plaintiff Tony Nunez asserted

two claims against Defendants Santos and Vizzusi: (1) a § 1983 claim for violation of Plaintiff

Tony Nunez's constitutional right to familial relationship; and (2) a wrongful death claim under

California state law that Defendants negligently and wrongfully caused Nunez's death.

Defendants denied those claims and asserted two defenses: (1) the defense of self and others, and

(2) contributory negligence on the part of Nunez as the cause of his own death.

Plaintiff Estate of Anthony Nunez by and through its personal representative Sandy

Sanchez ("Plaintiff Estate") asserted a § 1983 claim against Defendants for the use of excessive

force against Nunez. Defendants Michael Santos and Anthony Vizzusi denied this claim and

asserted the defense of self and others.

Plaintiffs completed their case-in-chief on June 24, 2019, ECF No. 188 at 793, and

Defendants completed their case-in-chief on June 25, 2019, ECF No. 189. On June 25, 2019, at

the close of all the evidence and prior to closing arguments, Defendants Michael Santos and

Anthony Vizzusi (collectively, "Defendants") moved for judgment as a matter of law pursuant to

Federal Rule of Civil Procedure 50(a). ECF No. 189 at 1174-1189. Specifically, Defendants

3

argued they were entitled to qualified immunity from the excessive force claim because "there is . . . undisputed evidence that Nunez . . . raised and pointed his gun at officers" and that his doing so constituted "an immediate threat to the safety of officers or others" that justified the use of deadly force. ECF No. 189 at 1175, 1179. The Court denied the motion and allowed the entire case to go to the jury.

On July 2, 2019, the jury returned the following verdict. First, the jury found in favor of Plaintiff Estate as to its excessive force claim in the amount of $2.6 million. ECF No. 151 ("Verdict Form") at 2-3, 4. Second, the jury found in favor of Plaintiff Tony Nunez as to his wrongful death claim in the amount of $50,000. *Id.* at 2-3, 4. With regard to Defendants' contributory negligence defense, the jury found that Nunez was negligent in causing his own death and that he caused 10% of the harm in Plaintiff Tony Nunez's wrongful death claim. *Id.* at 4. Because the jury found Nunez 10% negligent, the Court reduced the $50,000 award to Plaintiff Tony Nunez by 10% to $45,000. ECF No. 178. Finally, the jury found in favor of Defendants as to Plaintiff Tony Nunez's right to familial relationship claim. Verdict Form at 2-3.

The verdict form also contained questions to aid the Court in its qualified immunity determination. Of relevance here, the jury answered "No" in response to the following questions: (1) "Was Decedent Anthony Nunez pointing a gun at officers at the time Defendant Michael Santos shot Decedent Anthony Nunez?" and (2) "Was Decedent Anthony Nunez pointing a gun at officers at the time Defendant Anthony Vizzusi shot Decedent Anthony Nunez?" *Id.* at 2-3.

### 3. The Instant Motions

On July 30, 2019, Defendants filed post-trial motions. ECF No. 193 ("Def. Mot."). First, pursuant to Federal Rule of Civil Procedure 50(b), Defendants renew their motion for judgment as a matter of law as to the excessive force claim on the grounds that Defendants' use of deadly force did not rise to the level of excessive force and that even if it did, the Defendants are entitled to qualified immunity. *Id.* at 8; ECF No. 189 at 1181-82. Second, pursuant to Federal Rule of Civil Procedure 59, Defendants seek "a new trial on liability and/or a remittitur because the jury's verdict and award were against the weight of the evidence, and the amount of damages awarded to

4

Plaintiff Estate is excessive." Def. Mot. at 2. As to damages, the Rule 59 motion purports to challenge only the amount of damages awarded to Plaintiff Estate—that is, the award for the excessive force claim—and not the amount of damages awarded to Plaintiff Tony Nunez for the wrongful death claim.

Plaintiffs filed their opposition on August 5, 2019, ECF No. 197, and Defendants filed their reply on August 8, 2019, ECF No. 200.

### B. The Evidence at Trial

Because Defendants' motions require the Court to consider the sufficiency of the evidence in support of the jury's verdict in favor of Plaintiffs, the Court briefly summarizes the evidence at trial. The Court focuses on the evidence relevant to the instant motions.

#### 1. Juan Cervantes

Plaintiffs' first witness was Juan Cervantes. *See* ECF No. 186, Tr. at 242. Cervantes was Nunez's cousin. *Id.* at 289. At the time of the incident, Cervantes lived with Nunez and several other individuals at 994 Feller Avenue—the house where the shooting took place. *Id.* at 287. Specifically, as on July 4th, 2016, the following individuals lived at 994 Feller Avenue: Cervantes, Nunez, Cervantes's aunt Sandy Sanchez and her husband Jesse and their daughter Anissa, Cervantes's cousin Jose, and Cervantes's cousin Jesse. *Id.* at 288. Cervantes said that he had been living at 994 Feller Avenue with Nunez for "about six months." *Id.* at 289. Cervantes and Nunez also worked at the same grocery store, Mi Pueblo. *Id.* at 293.

Cervantes testified that, "in the days leading up to July 4th," Nunez "didn't want to eat right, he didn't want to go to work, he was very sad." *Id.* at 300. According to Cervantes, Nunez had missed work and had told Cervantes "that he wanted to kill himself" and "that he wanted to die." *Id.* at 303-04, 329. The reason for Nunez's sadness, said Cervantes, was that several family members living at 994 Feller Avenue left San Jose for a family reunion that Nunez could not attend. *Id.* at 298. According to Cervantes, Nunez had previously been "very active, a very friendly and happy person." *Id.* at 300.

Cervantes testified that, on one of the days leading up to July 4th, Cervantes returned home

Case No. 17-CV-03860-LHK
ORDER DENYING DEFENDANTS' POST-TRIAL MOTIONS

from work and found that "the lock on [his] Aunt Sandy's door, it was broken." *Id.* at 304. He

said that "it looked like somebody was searching through" the room. *Id.* at 304.

On July 4th, 2016, Cervantes his cousin Jose—who also worked at Mi Pueblo, *id.* at 293—

convinced Nunez to go to work. *Id.* at 309. According to Cervantes, that day, Nunez was "going

to move to a different department . . . , but it turned out he didn't have the correct shoes." *Id.* at

310. Nunez was therefore sent home. *Id.* Cervantes testified that, at some point after Nunez left,

Nunez's girlfriend found Cervantes at work. *Id.* at 310. She told him that "she heard something

like a firework go off at" the 994 Feller Avenue house. *Id.* at 310. Nunez's girlfriend also told

Cervantes that Nunez "might have shot himself." *Id.* at 311.

This report led Cervantes to go to home to 994 Feller Avenue, where he saw blood "both

inside and outside the house." *Id.* at 311. Cervantes said he found Nunez in his Aunt Sandy's

bedroom, "laying on the bed." *Id.* at 311-12. Cervantes said that Nunez was "facing down on the

bed." *Id.* at 310-12. Cervantes saw "lots of blood," *id.* at 311, including blood coming from

Nunez's head, *id.* at 318. Cervantes testified that he saw a pistol in Nunez's hand, which

Cervantes took away. *Id.* at 312. Cervantes then called 9-1-1 and told the operator "that [his]

cousin had shot himself and needed help as soon as possible." *Id.* at 313.

While he was on the phone, Cervantes went outside "to see if there was any help coming."

*Id.* at 315. Cervantes said that Nunez—who was still alive—followed Cervantes outside. *Id.*

Cervantes testified that Nunez told Cervantes "to hand over the gun or to shoot him," but

Cervantes refused. *Id.* At one point, Nunez tried unsuccessfully "to physically take the gun from"

Cervantes. *Id.*

Cervantes and Nunez went back into the house. *Id.* at 316. Once there, Cervantes said the

police instructed him to "put [the gun] in the backyard." *Id.* at 317. Cervantes complied. *Id.*

While Cervantes went to put the gun in the backyard, Nunez was "laying down on the floor"

"between the kitchen hallway and the living room." *Id.* Cervantes tried "to make [Nunez] react,

but he didn't react." *Id.* at 318.

When the police arrived, Cervantes met them outside. *Id.* at 319. Officers then placed

Cervantes in a police vehicle, where he remained for the remainder of the incident. *Id.* at 320-21. Cervantes testified that, at some point while he was sitting in the police vehicle, Cervantes heard "two shots." *Id.* at 322. When asked if there was "any time between the two shots," Cervantes responded, "Yes." *Id.* During cross examination, Cervantes acknowledged that during his deposition, he had testified that "there was a second, or less than a second between the two shots." *Id.* at 363.

Cervantes further testified that, after he heard the two shots, he "noticed that there were some cops . . . celebrating in way" by "giving each other handshakes and high fives." *Id.* at 323. After the incident was over, the officers took Cervantes to the police station. *Id.*

### 2. Charles Thomas

Plaintiffs next called Charles Thomas to the stand. Charles Thomas lives on Feller Avenue, across the street from the house where Nunez was shot. *See* ECF No. 186, Tr. at 372-73. Though Thomas was Nunez's neighbor, he was not familiar with Nunez. *Id.* at 375.

Thomas testified that he observed the events on July 4, 2016 from inside his house. When Thomas first saw Nunez, Nunez was with "two females," walking across the street toward Thomas's house. *Id.* at 374. Thomas observed that Nunez was "bleeding from the head on the right side." *Id.* According to Thomas, Nunez "fell down on the driveway" of 994 Feller Avenue, but then stood up and went inside the house at 994 Feller Avenue. *Id.* at 375.

At that point Thomas, who had been watching from his kitchen window, *id.* at 373, went to his bedroom "to lay down," *id.* at 375. As he lay down, his dog began "barking by the window side and was agitated." *Id.* at 376. Thomas went to the window to find out why his dog was barking, at which point he "saw policemen, maybe seven or eight of them," by the driveway of 994 Feller Avenue." *Id.* The officers appeared to be "backing away" from the driveway. *Id.* Thomas says he then "went and lay down again." *Id.* at 377; *see id.* at 403.

Thomas testified that at some point, a neighbor named Adan called him on the telephone and said there was "something going on" outside their houses. *Id.* at 383-84. Still on the phone with Adan, Thomas went to his kitchen window to watch. *Id.* at 384, 386. Thomas testified that it

United States District Court
Northern District of California

was a "sunny day," that the shooting took place during the "daytime," and that he could see Nunez clearly. *Id.* at 391, 412. Thomas saw Nunez come to the door of 994 Feller Avenue and "look to the left, look to the right, look forward," and then go back inside. *Id.* at 385. Thomas testified that Nunez did not appear to be holding anything in his hands and that his hands were at his side. *Id.*

Thomas then saw Nunez come to the doorway for a second time. *Id.* at 286. Thomas testified that Nunez looked to "both sides" and "forward," and then "took a step down from the level of the house." *Id.* According to Thomas, Nunez's arms were again down at his side. *Id.* at 387. Thomas confirmed that he did not see Nunez's "hands moving upwards towards his chest." *Id.* at 413. Thomas then "hear[d] a shot, a gunshot." *Id.* at 386. A second shot came "a few seconds later." *Id.* at 410. Nunez "went down" after the second shot. *Id.* at 386.

At no point before the shooting was Thomas aware that Nunez had a gun. *Id.* at 405. In addition, according to Thomas, he had "no idea where the bullets came from." *Id.* at 410.

Of relevance to Defendants' motions, Thomas stated that he was "focused more on [Nunez's] head movements and where [Nunez] was looking." *Id.* at 407-08. Thomas therefore acknowledged that he "may have said" in his deposition that he was "not paying attention" to Nunez's hands. *Id.* at 411. Thomas also admitted that he was he was "afraid" during the incident because Thomas was "concerned about a stray bullet that might find its way into [his] home." *Id.* at 399-400.

In addition, Thomas testified that he has "three views" in his house: a window in his kitchen, a door with stained glass, and a window in his living room. *Id.* at 392, 395. Although the stained glass in the door is composed of different pieces of glass, Thomas confirmed that he "can see clearly" "through the stained glass." *Id.* at 395. Thomas testified that he was "going from window to window" as the incident unfolded outside. *Id.* at 409. Thomas says that when he saw Nunez get shot, however, he was looking through his kitchen window. *Id.* at 393, 412.

### 3. Officer Rubens Dalaison

Plaintiffs' third witness was Rubens Dalaison, one of the SJPD officers who responded to the priority service call at 994 Feller Avenue on July 4, 2016. *See* ECF No. 186, Tr. at 422, 428.

Case No. 17-CV-03860-LHK
ORDER DENYING DEFENDANTS' POST-TRIAL MOTIONS

Officer Dalaison is a member of the crisis intervention team ("CIT"), and as such is "trained on identifying suicidal persons or subjects and talking with them." *Id.* at 423-24. Plaintiffs' direct examination of Officer Dalaison spanned the second and third days of trial. *Id.* at 242; ECF No. 186, Tr. at 456. Defendants also called Officer Dalaison as a witness, on the fourth day of trial. ECF No. 188, Tr. at 729.

Officer Dalaison testified that he first learned of the incident through a radio call, which declared that "there was a person that had a gun and that was possibly suicidal." *Id.* at 425. Officer Dalaison also learned, through radio updates, that "a family member was present" and that the "person had shot himself and officers were setting up a perimeter." *Id.* at 430. When Officer Dalaison arrived at the scene, other officers were already present. *Id.* at 430. Sergeant Thomas Boyle was "coordinating the perimeter" and generally "managing the scene." *Id.* at 432. Officer Dalaison testified that he "took up a position across the street" from 994 Feller Avenue. *Id.* at 435.

About five to ten minutes later, Officer Dalaison saw someone emerge from the 994 Feller Avenue residence. *Id.* at 439. Officer Dalaison says he saw a gun in the man's right hand. Therefore, when Nunez emerged from the house, Officer Dalaison shouted out "something to the effect of 'man at the door has a gun.'" ECF No. 187, Tr. at 506. Officer Dalaison also communicated this information over the radio. *Id.* Officer Dalaison testified that he remembered seeing Nunez crying as he stood at the threshold of the door. *Id.* at 509, 513. Officer Dalaison further testified that he could "see blood on [Nunez's] head." *Id.* at 510. At that point, Officer Dalaison "started to . . . establish some form of communication with him." *Id.* at 512. Officer Dalaison said that he told Nunez things like "Drop the weapon," and "Let us help you." *Id.* Nunez stood at the threshold for "seven to ten minutes." *Id.* at 514. During that time, said Officer Dalaison, Nunez appeared "sluggish, disconnected, and zombie-like." *Id.* at 514. Officer Dalaison testified that Nunez "raised the gun up to his [own] head . . . three to four times," but each time Officer Dalaison would say "Hey, don't do that" and Nunez "would bring the gun back down." *Id.* at 515. However, Officer Dalaison admitted, "I couldn't tell you whether he heard

me." *Id.* Officer Dalaison also testified he "never saw [Nunez] point the gun at anyone but himself" during the first seven to ten minutes Nunez was at the doorway. *Id.* at 527. Eventually, Nunez "staggered back inside." *Id.* at 529.

Officer Dalaison testified that he then changed positions to where two other officers, Officer Vizzusi and Officer Aneez Raghavan, had positioned themselves near a pickup truck. *Id.* at 538 (Plaintiffs' Exhibit 19); ECF No. 188, Tr. at 841.

Officer Dalaison testified that Nunez came to the doorway for a second time. ECF No. 187, Tr. at 526. According to Officer Dalaison, when Nunez reappeared, Nunez "appeared more crisp and sturdy." *Id.* at 538. Nunez seemed "more intentional with his demeanor" to Officer Dalaison. ECF No. 188, Tr. at 842. In addition, Officer Dalaison testified that Nunez's "gun was a little bit higher than . . . before." ECF No. 187, Tr. at 539. Specifically, the gun was "up closer to his waist above his belt." *Id.* at 532. However, Officer Dalaison acknowledges that he never saw Nunez point the gun "at somebody." *Id.* In response to Nunez's reappearance, Officer Dalaison said he "yelled out something to the effect of, 'put the gun down,' or 'drop it.'" *Id.* Officer Dalaison testified that he then turned to move around the truck. *Id.* at 539-540. As he was doing so, Officer Dalaison claimed to hear two shots "almost simultaneously," "less than a second" apart. *Id.* at 541.

### 4. Dr. Michelle Jorden

Plaintiffs called Dr. Michelle Jorden on the third day of trial. ECF No. 187, Tr. at 456. To accommodate her schedule, Plaintiffs questioned her between the two parts of Officer Dalaison's direct examination. *Id.* at 459.

Dr. Jorden works at the Santa Clara County Office of the Medical Examiner-Coroner as a forensic pathologist and neuropathologist. *Id.* at 460-61. Though Dr. Jorden is currently the Chief Medical Examiner, she was an Assistant Medical Examiner at the time of the autopsy. *Id.* at 461.

On July 5, 2016, Dr. Jorden performed the autopsy on Nunez's body. *Id.* at 462. The body was still handcuffed with its arms behind its back when Dr. Jorden received it. *Id.* at 469. Dr. Jorden observed several bullet wounds on the body, corresponding to four different bullets. First,

10

Dr. Jorden testified that the body had "a bullet wound on the right frontal area of the skull." *Id.* at 470. Dr. Jorden referred to this wound as "the right frontal forehead wound," and the Court does the same. *Id.* at 471. The right frontal forehead wound was "a contact wound," meaning that Nunez caused it by "put[ting] the gun in contact with his forehead" and shooting himself. *Id.* at 488. Two bullets were recovered from the right frontal forehead wound. *Id.* at 472. These bullets did not kill Nunez. *Id.* at 494. That is because the two bullets to the forehead "did not pass through the skull and into brain matter"; they were "recovered from the scalp outside the skull." *Id.* at 473. Nevertheless, the bullets caused "swelling of the brain," which "can be potentially life threatening." *Id.* at 492.

Second, Dr. Jorden testified that there was a "gunshot wound on the lower left back." *Id.* at 473. This wound was an entrance wound, i.e., a wound where a bullet entered the body. *Id.* at 475. Dr. Jorden traced the path of the bullet upward through the body and determined that it exited "on the upper left chest below the collarbone." *Id.* at 476-77. The bullet struck, among other things, Nunez's heart and aorta. *Id.* at 479-480. Dr. Jorden testified that the bullet was shot from a distance that "exceeded two to three feet." *Id.* at 478.

Third, Dr. Jorden testified that there was a "gunshot *wound* to the mid-chest" of the body. *Id.* at 480. This wound was another entrance wound. *Id.* The bullet that caused this entrance wound traveled downward through the chest cavity and exited the body "on the right mid-back." *Id.* at 482, 484. This bullet caused "significant damage" to Nunez's right lung. *Id.* at 483. According to Dr. Jorden, both this shot and the shot to Nunez's lower left back were caused by "high velocity ammunition based on the destructive nature of the wounds." *Id.* at 483. Such ammunition is "used in rifles." *Id.* at 484.

Dr. Jorden testified that both shots to Nunez's torso "were fatal." *Id.* Dr. Jorden did not specify how quickly or slowly the gunshots killed Nunez. She also did not specify which shot ultimately caused Nunez's death.

Also relevant here, Dr. Jorden testified that "the body had fecally soiled" and "blood stained" underwear. *Id.* at 463. That is, in layman's terms, "the body had used the bathroom on

11

itself." *Id.* at 463. Several autopsy photographs showing the fecally soiled underwear were also admitted into evidence. *Id.* at 464-65 (Plaintiffs' Exhibit 39, page 661; Plaintiffs' Exhibit 39, page 662). According to Dr. Jorden, "it is common for individuals who suffer fatal wounds to defecate" in both "natural deaths and trauma." *Id.* at 493. Dr. Jorden went on to explain the physiology of the phenomenon. *Id.* She stated that "when death is sudden, what happens is there's a relaxation of muscles and it's not uncommon to see urine and feces, especially if there's feces in the bowel." *Id.* at 492.

### 5. Officer Michael Santos

The fifth witness at trial was Officer Michael Santos, one of the defendants in the case. Plaintiffs called Officer Santos on the third day of trial, and Defendants called Officer Santos on the fourth day of trial. ECF No. 187, Tr. at 456; ECF No. 188, Tr. at 729.

Officer Santos was one of the SJPD officers who responded to the priority service call at 994 Feller Avenue on July 4, 2016. ECF No. 187, Tr. at 564-65. Officer Santos testified that dispatch had informed him "there was a person who was suicidal and had a gun" at the scene. *Id.* at 565. "Because the event involved a deadly weapon," Officer Santos explained, he brought his rifle with him. *Id.* at 566. Officer Santos testified that, when he arrived, he stationed himself "behind a very large tree" at "the northwest corner of Story and Feller." *Id.* at 569. 994 Feller Avenue is the second house away from the corner of Feller Avenue and Story Road. ECF No. 186, Tr. at 373.

Officer Santos testified that, at some point, he saw Cervantes exit the house and run toward the officers. ECF No. 187, Tr. at 569. Officer Santos described Cervantes as "hysterical" and "upset." *Id.* at 570. Officer Santos said he learned that "there was someone inside [the house] who had shot themselves." *Id.* at 570. Based on that information, said Officer Santos, the decision was made that a group of officers "would gather and go to the house in order to do a welfare check on the person who had shot themselves." *Id.* Officer Santos was among those officers. *Id.* at 582. Officer Santos testified that at some point, the officers stopped approaching 994 Feller Avenue because Officer Dalaison yelled out that Nunez was at the door with a gun. *Id.*

United States District Court
Northern District of California

at 582-83. Officer Santos then "went back to the original position he was at," behind the tree. *Id.* at 586.

However, Officer Santos moved because "the position at the tree created what [he] believed was a crossfire issue for where [he] thought Officer Dalaison was" and because "it didn't give [him] a good view of the porch" where Nunez was standing. *Id.* at 588. Officer Santos testified that he moved from the tree to the porch of the house at the corner of Feller Avenue and Story Road, which was across the street from 994 Feller Avenue. *Id.* at 587, 589 (Plaintiffs' Exhibit 31). After Officer Santos set up his rifle in the second location, he watched Nunez through the magnifier on his rifle. ECF No. 188, Tr. at 894-95. Officer Santos testified that Nunez was "moving kind of like a zombie," that he was not "aggressive" or "provocative" and that he had "blood trickling down the left side of his face." ECF No. 187, Tr. at 592-93. Officer Santos further testified that Nunez had a gun "in his right hand" and that he would "raise it up every so often, kind of inadvertently." *Id.* at 593. According to Officer Santos, Nunez "was not responsive" to Officer Dalaison and "wasn't putting down the gun." *Id.* However, at that point, said it did not seem to Officer Santos like Nunez was "intentionally pointing the gun at anybody." *Id.* at 594. Officer Santos testified that he saw Nunez go back inside the house eventually. *Id.* at 597.

Officer Santos testified that, at this point, he was "nervous" but not "distracted." *Id.* at 598.

Officer Santos testified that, at some point in time, Nunez came back outside. *Id.* at 603. According to Officer Santos, Nunez appeared "more confident" this time and was "twirling the gun on his finger." *Id.* at 605. Specifically, Officer Santos claims Nunez was "twirling the gun like a cowboy" with his arm extended "a little more than 90 degrees" and that he did so "about three times." *Id.* at 606-07. Then, Officers Santos says Nunez pointed the gun "in the direction of the officers to the northwest." ECF No. 188, Tr. at 910. Officer Santos testified that he then fired a single shot. ECF No. 187, Tr. 608-10. When asked whether he was the first officer to fire, Officer Santos responded, "I don't know if I was the first or if they were simultaneous." *Id*. 611.

Officer Santos also testified that he did not know precisely where the bullet struck Nunez. *Id.* at 609.

On July 4, 2016, the gun Officer Santos fired was an AR-15 rifle. *Id.* at 563. Officer Santos testified that, as of July 4, 2016, he "had received training in how to use a long gun, or a long rifle." *Id.* at 556. Officer Santos further testified that the AR-15 has several "devices attached to it that help [him] to see [his] intended target better than what [he] might be able to see through [his] naked eye." *Id.* at 560. Those devices include "an optic which has a reticle, and then behind that there's a magnifier." *Id.* Specifically, the magnifier is a "three power magnifier." ECF No. 188, Tr. at 898. As Officer Santos explained, the reticle has "a holographic bulls eye, . . . a circle and a dot," which indicates "where you expect your bullet to strike your target." ECF No. 187, Tr. at 560-61.

### 6. Officer Anthony Vizzusi

The sixth witness at trial was Officer Anthony Vizzusi, the other defendant in the case. Plaintiffs called Officer Vizzusi on the third day of trial, and Defendants called Officer Vizzusi on the fourth day of trial. ECF No. 187, Tr. at 456; ECF No. 188, Tr. at 729.

Officer Vizzusi and his partner, Officer Raghavan, responded to the July 4, 2016 priority service call at 994 Feller Avenue. ECF No. 187, Tr. at 620-21. Officer Vizzusi says he understood from dispatch that there was a suicidal subject armed with a firearm at the scene. *Id.* at 621. According to Officer Vizzusi, the first thing he saw when he arrived was Nunez on the porch of 994 Feller Avenue, "with a handgun down to his side." ECF No. 187, Tr. at 622; *see* ECF No. 188, Tr. at 937. Officer Vizzusi says he also saw Officer Dalaison and "worried that Mr. Nunez would end up shooting" Officer Dalaison. ECF No. 188, Tr. at 937. Officer Vizzusi testified that Nunez "had blood coming from his head" and that he "appeared to be out of it." ECF No. 187, Tr. at 623. Officer Vizzusi said that Nunez eventually went inside. *Id.* at 624.

Officer Vizzusi testified that while Nunez was on the porch the first time, Officer Vizzusi had positioned himself behind a pickup truck in the driveway of a house across the street from 994 Feller Avenue. ECF No. 188, Tr. at 940. Officer Vizzusi put the rifle over the hood of the pickup

truck and watched Nunez through the magnifier. *Id.* at 941-42.

According to Officer Vizzusi, when Nunez came out of the house the second time, Nunez was facing Officer Vizzusi's location. ECF No. 187, Tr. at 628. Officer Vizzusi testified that Nunez "then twirled the gun a couple times like a cowboy," "grabbed it by the handle like a cowboy," and "aimed it in [Officer Vizzusi's] direction." *Id.* at 628. Officer Vizzusi then shot Nunez. *Id.* at 629. Officer Vizzusi admits that he "heard a loud noise that was consistent with a gunshot" before he fired, but that he had already made his decision to fire and was unable to stop. *Id.* at 629; *see* ECF No. 188, Tr. at 949-50.

Officer Vizzusi testified that "he had gone through rifle specialist training" prior to the incident. ECF No. 188, Tr. at 930. Officer Vizzusi testified that, on July 4, 2016, he used a Colt .223 assault rifle. ECF No. 187, Tr. at 615. He explained that his rifle has "an EOTech G23 magnifier," which he was using on July 4, 2016. ECF No. 188, Tr. at 943. Officer Vizzusi confirmed that the magnifier is "a three power magnifier," which "increases your vision up to three times." *Id.*

### 7. Lieutenant Paul Joseph

Defendants called Paul Joseph, a lieutenant with the SJPD, to the stand. ECF No. 189, Tr. at 975. Lieutenant Joseph was among the SJPD officers who responded to the priority service call at 994 Feller Avenue on July 4, 2016. *Id.* at 977. Lieutenant Joseph testified that, after an officer shoots a subject, "the officer needs to be isolated from other officers and what's called a public safety statement needs to be obtained." *Id.* at 987. Lieutenant Joseph testified that one of the officers took the public safety statement from Officer Santos and that Officer Santos was then "transported down to the Homicide Unit at San Jose P.D. for the complete interview and investigation." *Id.* at 988. Lieutenant Joseph testified that the same steps were taken with respect to Officer Vizzusi. *Id.* at 990.

After Officers Santos and Vizzusi "were taken out of the scene," Lieutenant Joseph formed "an arrest team." *Id.* at 990-91. The team approached Nunez and handcuffed him. *Id.* at 991. Lieutenant Joseph testified that the team located a "handgun on the ground about eight to ten feet

15

to the right of where [Nunez] [was] lying." *Id.* at 992. Once "the house was secured," Lieutenant

Joseph called in the paramedics. *Id.* at 991.

### 8. Other witnesses

In addition to the above witnesses, Plaintiffs called four other witnesses. Plaintiffs called

Officer Aneez Raghavan and Lieutenant Thomas Boyle, two other SJPD officers who responded

to the incident at 994 Feller Avenue on July 4, 2016. ECF No. 187, Tr. at 646, 666. Plaintiffs also

called Sandy Sanchez, who lived at 994 Feller Avenue and had cared for Nunez since he was five

years old. *Id.* at 675. Plaintiffs' last witness was expert witness Roger Clark, a police procedures

consultant. ECF No. 188, Tr. at 738, 744.

As already noted, Defendants called Officers Dalaison, Santos, and Vizzusi as defense

witnesses. Defendants also presented the testimony of four other witnesses: (1) Pierre Dacunha, a

neighbor located at 954 Feller Avenue, ECF No. 188, Tr. 859; (2) Jose Sanchez, who lived at 994

Feller Avenue, *id.* at 794; (3) Dr. Emily Keram, who was offered as an expert in the field of

forensic psychiatry, *id.* at 1009; and (5) Scott Seaman, who was offered as an expert on police

practices, *id.* at 1050.

### 9. Video Footage

At trial, the parties introduced footage from two security cameras that were mounted on a

house across the street from Nunez's residence. *See* Plaintiffs' Exhibits 14, 15, 16.

The security camera footage is time-stamped. The security camera footage shows that the

July 4, 2016 incident occurred in broad daylight in a residential neighborhood. There are

neighboring houses and numerous cars in the driveways and on the street. Nunez's residence is

the second house to the left from a street corner, the corner of Feller Avenue and Story Road based

on Cervantes' testimony. For simplicity, the Court will refer to the corner as the "street corner."

The front door of Nunez's residence is almost entirely obscured by a utility pole and a column on

the front porch. Moreover, given the angle of the security camera on the house across from 994

Feller Avenue, the image of Nunez's front door appears very small in the corner of the footage.

The images in the security camera footage are not clear, so persons and their movements can be

seen only generally.

At 16:45:00–16:49:30, the security camera footage depicts a man—presumably Cervantes—who is followed by a man out of the residence—presumably Nunez—with a slower, uneven gait. It appears that Cervantes is on the phone. Cervantes exits the driveway of the Nunez residence and walks down the street to the street corner, and Nunez follows him. Cervantes and Nunez then turn around and return inside Nunez's residence.

At 17:08:00–17:10:00, a police officer contact team is seen approaching the house from the street corner. The contact team get all the way to the driveway of the Nunez residence and then are seen retreating all the way back to the street corner.

At 17:18:45–17:22:15, Officer Dalaison is seen standing beside a Chevrolet Suburban across the street from Nunez's residence with his gun, pointing at the ground, at his right side. Nunez is moving around in the doorway and walks out onto the porch and appears to look around. Nunez is too far away, and the image is not clear enough, to tell what he is otherwise doing.

At 17:23:55–17:24:05, Nunez reappears on the porch, but the image is very grainy, and Nunez is obscured by a utility pole and the porch column. Nunez then falls to the ground. The timing from when Nunez reappears on the porch to when he falls to the ground is approximately ten seconds.

## II.    DEFENDANTS' RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW

"[A] party must make a Rule 50(a) motion for judgment as a matter of law before a case is submitted to the jury. If the judge denies or defers ruling on the motion, and if the jury then returns a verdict against the moving party, the party may renew its motion under Rule 50(b)." *EEOC v. Go Daddy Software, Inc.*, 581 F.3d 951, 961 (9th Cir. 2009). In accordance with Rule 50, Defendants moved for judgment as a matter of law prior to closing arguments, on July 25, 2019. ECF No. 189 at 1174-1189. Defendants now renew their motion for judgment as a matter of law on the ground that the evidence at trial compels a finding of qualified immunity for Defendants Michael Santos and Anthony Vizzusi as to Plaintiff Estate's excessive force claim.

17

The Court first reviews the applicable legal standards and then turns to the merits of whether Defendants are entitled to qualified immunity.

## C. Legal Standards

### 1. Judgment as a Matter of Law

A court may grant a motion for judgment as a matter of law against the nonmoving party only if "there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue." Fed. R. Civ. P. 50(a). Specifically, the Ninth Circuit has made clear that a court "cannot disturb the jury's verdict if it is supported by substantial evidence." *Lambert v. Ackerley*, 180 F.3d 997, 1012 (9th Cir. 1999). Substantial evidence means "evidence adequate to support the jury's conclusion, even if it is also possible to draw a contrary conclusion" from the same evidence. *Castro*, 833 F.3d at 1066 (internal quotation marks omitted). "Thus, although the court should review the record as a whole, it must disregard evidence favorable to the moving party that the jury is not required to believe, and may not substitute its view of the evidence for that of the jury." *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 151 (2000). In other words, entry of judgment as a matter of law is warranted only "if the evidence, construed in the light most favorable to the nonmoving party, permits only one reasonable conclusion, and that conclusion is contrary to the jury's verdict." *Castro*, 833 F.3d at 1066 (internal quotation marks omitted).

### 2. Excessive Force

Defendants seek judgment as a matter of law as to Plaintiff Estate's excessive force claim under the Fourth Amendment. "Excessive force claims are founded on the Fourth Amendment right to be free from unreasonable seizures of the person." *Shafer v. Cty. of Santa Barbara*, 868 F.3d 1110, 1115 (9th Cir. 2017), *cert. denied sub nom. Shafer v. Padilla*, 138 S. Ct. 2582 (2018). Specifically, "[t]he Fourth Amendment permits law enforcement to use 'objectively reasonable' force." *S.B. v. Cty. of San Diego*, 864 F.3d 1010, 1013 (9th Cir. 2017) (quoting *Graham v. Connor*, 490 U.S. 386, 396-97 (1989)). Accordingly, "[t]he question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham*, 490 U.S. at 397. The U.S.

Supreme Court has repeatedly emphasized that "the 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Cty. of Los Angeles, Calif. v. Mendez*, 137 S. Ct. 1539, 1546 (2017) (alterations and internal quotation marks omitted).

As in other Fourth Amendment contexts, judging the reasonableness of a particular use of force requires carefully balancing the "nature and quality of the intrusion" on a person's liberty with the "countervailing governmental interests at stake." *Id.* at 396. First, the Court considers the "the type and amount of force inflicted," for "[e]ven where some force is justified, the amount actually used may be excessive." *Glenn v. Washington Cty.*, 673 F.3d 864, 872 (9th Cir. 2011) (internal quotation marks omitted). The Court then assesses the strength of the Government's interest in the force used. *Id.* On that score, the Court's inquiry focuses upon the three factors enumerated by the U.S. Supreme Court in *Graham*: (1) "whether the suspect poses an immediate threat to the safety of the officers or others," (2) "the severity of the crime at issue," and (3) "whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* (quoting *Graham*, 490 U.S. at 396). "Other relevant factors include the availability of less intrusive alternatives to the force employed, whether proper warnings were given and whether it should have been apparent to officers that the person they used force against was emotionally disturbed." *Id.*

It is undisputed that here, Defendants used deadly force against Nunez. "The intrusiveness of a seizure by means of deadly force is unmatched." *Tennessee v. Garner*, 471 U.S. 1, 9 (1985). For that reason, the U.S. Supreme Court held in *Tennessee v. Garner* that "[w]here the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so." *Id.* at 11; *see also Espinosa v. City & Cty. of San Francisco*, 598 F.3d 528, 537 (9th Cir. 2010) (applying stated holding of *Garner*). In other words, "[l]aw enforcement officers may not shoot to kill unless, at a minimum, the suspect presents an immediate threat to the officer or others, or is fleeing and his escape will result in a serious threat of injury to persons." *Harris v. Roderick*, 126 F.3d 1189, 1201 (9th Cir.

19

Case No. 17-CV-03860-LHK
ORDER DENYING DEFENDANTS' POST-TRIAL MOTIONS

1   1997).  Thus, the reasonableness of Defendants' actions depends in large part on whether Nunez

2   posed an immediate threat to the safety of officers or others.

3       **3.  Qualified Immunity**

4       "The doctrine of qualified immunity shields officials from civil liability so long as their

5   conduct does not violate clearly established statutory or constitutional rights of which a reasonable

6   person would have known." *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (per curiam).  "To

7   determine whether an officer is entitled to qualified immunity, the Court asks, in the order it

8   chooses, (1) whether the alleged misconduct violated a constitutional right and (2) whether the

9   right was clearly established at the time of the alleged misconduct." *Hernandez v. City of San*

10  *Jose*, 897 F.3d 1125, 1132 (9th Cir. 2018) (internal quotation marks and alterations omitted).

11  Qualified immunity applies unless the answer to both questions is "yes." *Pearson v. Callahan*,

12  555 U.S. 223, 232 (2009).  "This exacting standard gives government officials breathing room to

13  make reasonable but mistaken judgments by protecting all but the plainly incompetent or those

14  who knowingly violate the law." *City & County of San Francisco v. Sheehan*, 135 S. Ct. 1765,

15  1774 (2015) (internal quotation marks and alterations omitted).

16      "[Q]ualified immunity was conceived as a summary judgment vehicle, and the trend of the

17  [United States Supreme] Court's qualified immunity jurisprudence has been toward resolving

18  qualified immunity as a legal issue before trial whenever possible." *Morales v. Fry*, 873 F.3d 817,

19  823 (9th Cir. 2017).  Nonetheless, a qualified immunity case may proceed to trial "[w]hen there

20  are disputed factual issues that are necessary to a qualified immunity decision." *S.R. Nehad v.*

21  *Browder*, 929 F.3d 1125, 1140 (9th Cir. 2019) (internal quotation marks omitted).  For instance,

22  "facts related to an officer's knowledge and what conduct actually occurred could be disputed

23  material facts to be determined by the fact finder." *Morales*, 873 F.3d at 823 (citing *Act*

24  *Up!/Portland v. Bagley*, 988 F.2d 868, 873 (9th Cir. 1993)).  At the same time, however, the

25  second prong of the qualified immunity inquiry—whether the constitutional right was "clearly

26  established"—"is a matter of law to be decided by a judge" and cannot be submitted to the jury.

27  *Reese v. Cty. of Sacramento*, 888 F.3d 1030, 1037 (9th Cir. 2018).  When a qualified immunity

28
Case No. 17-CV-03860-LHK
ORDER DENYING DEFENDANTS' POST-TRIAL MOTIONS

case is tried, then, "[a] bifurcation of duties is unavoidable: only the jury can decide the disputed factual issues, while only the judge can decide whether the right was clearly established once the factual issues are resolved." *Morales*, 873 F.3d at 823. As a procedural matter, "the ultimate question of qualified immunity is reserved for the judge to be decided after trial based on the jury's resolution of the disputed facts." *Id.* (endorsing Ninth Circuit Model Civil Jury Instruction 9.34 (2017)); *see also Tortu v. Las Vegas Metro. Police Dep't*, 556 F.3d 1075, 1085 (9th Cir. 2009) (second prong of qualified immunity "is an issue for a judgment as a matter of law under Rule 50(a) and (b)").

### D. Discussion

In their renewed motion for judgment as a matter of law, Defendants ask the Court to find that Defendants are entitled to qualified immunity. As to the first prong of the qualified immunity test—whether there has been a violation of a constitutional right—Defendants attack the sufficiency of the evidence to support the jury's verdict that Defendants used excessive force in violation of the Fourth Amendment. As to the second prong—whether the constitutional right violated was "clearly established" at the time of the relevant conduct—Defendants contend that no clearly established law prohibited a reasonable officer in Defendants' positions from using deadly force at the time of the shooting. Def. Mot. at 9, 13. For the following reasons, the Court holds that neither argument has merit and that Defendants are thus not entitled to qualified immunity.

### 1. Substantial Evidence Supports the Jury's Finding That There Has Been a Violation of a Constitutional Right

Defendants contend Plaintiff Estate's excessive force claim fails as a matter of law because the evidence at trial established that Defendants' use of deadly force was reasonable. Specifically, Defendants attempted to show at trial that Nunez "raised and pointed his gun at officers" and that his doing so constituted "an immediate threat to the safety of officers or others" that justified the use of deadly force. ECF No. 189, Tr. at 1175, 1179. The jury did not accept Defendants' theory, however. On the verdict form, the jury answered "No" in response to the following questions: (1) "Was Decedent Anthony Nunez pointing a gun at officers at the time Defendant Michael Santos

shot Decedent Anthony Nunez?" and (2) "Was Decedent Anthony Nunez pointing a gun at officers at the time Defendant Anthony Vizzusi shot Decedent Anthony Nunez?" ECF No. 151 at 2-3. The jury then went on to find by a preponderance of the evidence that Defendants' actions constituted excessive force. *Id.*

In their initial Rule 50(a) motion, Defendants sought judgment as a matter of law on the grounds that the "undisputed evidence" showed "that Mr. Nunez raised and pointed his gun at officers." ECF No. 189, Tr. at 1179. That is, Defendants argued that the only reasonable conclusion at which the jury could arrive was that Nunez pointed his gun at officers. In their renewed Rule 50(b) motion, Defendants propose a slightly different basis for judgment as a matter of law. Defendants, having apparently accepted the jury's finding that Nunez did not in fact point the gun at officers, now argue that Defendants "made a reasonable mistake of fact when they perceived that [Nunez] pointed a gun at officers." Def. Mot. at 9. The Court holds that neither argument warrants disturbing the jury's verdict on Plaintiff Estate's excessive force claim.

First, although Defendants do not explicitly renew their factual argument that Nunez pointed his gun at officers, the Court rejects it on the merits. Contrary to Defendants' assertion that the evidence Nunez pointed his gun at officers was "undisputed," there is substantial evidence supporting the jury's finding that Nunez was not pointing a gun at officers. Although it is undisputed that Nunez had a gun—the gun with which he had shot himself in the head—whether Nunez pointed the gun at officers was a major issue at trial. Plaintiffs explained their theory to the jury in both their opening statement and closing arguments: that at the time Nunez was shot, his arms were at his side and not pointing a gun at officers. *See* ECF No. 186 at 271; ECF No. 190, Tr. at 1221. As Defendants themselves acknowledge, Charles Thomas testified that he did not see Nunez point the gun at officers. ECF No. 189, Tr. at 1179; *see* ECF No. 187, Tr. at 387. In Defendants' view, however, Thomas's testimony is not sufficient to contradict their evidence because "his testimony is what he didn't see" rather than what he did see. *Id.* at 1180. Again, Defendants misstate the record. Thomas specifically testified that he saw "the way [Nunez] . . . was holding his arms" and that they were "on his person," "down at [his] side." ECF No. 187, Tr.

at 387. Thomas's testimony thus supports the Plaintiffs' version of events, under which Nunez was not pointing his gun at officers.

In response, Defendants attack the reliability of Thomas's testimony on several accounts, none of which the Court finds compelling. Def. Mot. at 14-15; ECF No. 189, Tr. at 1178-79. First, Defendants argue that because it is undisputed that Nunez had a gun on or near his person when he was shot, Thomas's testimony that he did not see Nunez with a gun is inconsistent with that undisputed fact. Def. Mot. 14-15. Based on this purported inconsistency, Defendants call into question the accuracy of Thomas's entire testimony. But the Court sees no such inconsistency. It is true that Thomas testified that he "did not see" Nunez with a gun and "was not even aware" that Nunez had a gun. ECF No. 186 at 405, 408, 410. However, Thomas did not testify generally that Nunez "did not point the gun toward officers." Def. Mot. at 15. Rather, Thomas specifically stated that he saw Nunez with his "arms down at [his] side" rather than "up at a 90 degree angle." *Id.* at 386-87. That Thomas may not have been able to see whether Nunez had a gun in his hands does not necessarily undermine his ability to see the angle of Nunez's arms. It was therefore reasonable for the jury to credit Thomas's testimony.

Defendants also point to Thomas's acknowledgements that he was "focused more on [Nunez's] head movements and where he was looking," *id.* at 407-08, that he was not sure whether he was "bending down" when the shooting occurred, *id.* at 409-410, and that he was on the phone with his neighbor during the incident, *id.* at 384, 386. To be sure, these are all valid concerns that the jury could consider when weighing Thomas's testimony. But there was also countervailing evidence that gave the jury reason to accept Thomas's testimony. After making these statements, on redirect, Thomas unequivocally confirmed that he was "looking through [his] kitchen window when [he] saw the young man shot." *Id.* at 412. He further confirmed that he "could see clearly through the kitchen window" and that he was "looking at just across from [him]." *Id.* at 412. In addition, Plaintiffs elicited testimony that Thomas had never previously testified in court and that "the only reason" he testified in the instant case was the subpoena. *Id.* at 390. In light of these countervailing considerations, and drawing all reasonable inferences in favor

23

of the nonmoving party, the Court does not believe that the issues Defendants' raise preclude the jury's conclusion that Thomas's testimony was reliable.

Defendants concede, as they must, that "the testimony of a lone reliable witness is enough to sustain Plaintiffs' burden of proof." Def. Mot. at 14; *United States v. Brown*, 421 F.2d 1283, 1285 (9th Cir. 1970) ("The testimony of one witness, if believed, is sufficient to prove a fact."). Nevertheless, Defendants emphasize testimony by the officers, which according to Defendants, uniformly support the theory that Nunez pointed a gun at officers. Of course, as Plaintiffs point out, the defense witnesses suffered from their own credibility issues. Officer Dalaison—the principal witness upon which Defendants rely—was not watching Nunez when the shooting occurred because he was changing locations. Moreover, the jury was entitled to discount the Defendants' own testimony as self-serving. *See, e.g.*, *Estate of Casillas v. City of Fresno*, 342 F. Supp. 3d 990, 999 (E.D. Cal. 2018) (stating, in an excessive force suit against Officer Shipman, that "the Court cannot ignore the possibility that Officer Shipman's testimony may be self-serving").

More to the point, it is simply not enough that Defendants presented evidence sufficient to support a finding that Nunez pointed his gun at officers. That is because the jury was not required to credit Defendants' evidence. Although the Defendants provided an account of the incident that, if believed, would have supported a defense verdict, the Court cannot set aside the jury's verdict on the mere possibility of a different result. *See Wallace v. City of San Diego*, 479 F.3d 616, 630 (9th Cir. 2007) ("Although the district court noted the possibility that it may have reached a different conclusion if it were sitting as fact-finder, the court may not grant a new trial simply because it would have arrived at a different verdict."). In *Willis v. City of Fresno*, for instance, the Ninth Circuit said that because "the jury heard conflicting accounts as to whether Willis was reaching for his gun when Officer Catton fired, it was for the jury to decide which version of events to believe." *Willis v. City of Fresno*, 680 F. App'x 589, 591 (9th Cir. 2017) ("The jury could reasonably have concluded from the evidence that Willis was not reaching for his gun and that Officer Catton's use of force was therefore unreasonable"). The same is true here. The

United States District Court
Northern District of California

instant case put to the jury the choice between Defendants' account and Plaintiffs' account—both of which were supported by substantial evidence—and the jury apparently chose the latter. It is not the role of the Court to overrule that choice.

Second, the Court addresses Defendants' argument that the evidence compels a finding that the officers "made a reasonable mistake of fact when they perceived that [Nunez] pointed a gun at officers." Def. Mot. at 11. At the outset, the Court notes that because a post-trial Rule 50(b) motion "is a renewed motion, a proper post-verdict Rule 50(b) motion is limited to the grounds asserted in the pre-deliberation Rule 50(a) motion." *Go Daddy Software*, 581 F.3d at 961. Defendants did not argue that they "acted upon a reasonable mistake of fact" in their original Rule 50(a) motion. In fact, Defendants never articulated the "reasonable mistake of fact" theory to the jury. At no point during their opening statement or closing arguments did Defendants ask the jury to find that, even if it found that Nunez did not point a gun at officers, Defendants reasonably believed that Nunez did. Instead, Defendants chose to rest their case on the contention that Nunez did in fact point a gun at officers. The Court is therefore not required to consider the reasonable mistake of fact theory.

Even on the merits, however, the Court finds no grounds for setting aside the jury's verdict. The jury was instructed that, in deciding whether the Defendants used excessive force, it should consider multiple factors, including "whether a reasonable officer would have or should have accurately perceived a mistaken fact." ECF No. 189 at 1160. In arriving at a verdict in favor of Plaintiffs, then, the jury necessarily found that any mistake of fact was not reasonable. *See Willis*, 680 F. App'x at 591 ("Since the jury concluded that the force used was not justified, it must have concluded that Willis was not reaching for the gun and thus did not pose an immediate threat of harm when Officer Catton fired.").

Defendants contend this finding was contrary to the evidence in the record. "Where an officer's particular use of force is based on a mistake of fact, we ask whether a reasonable officer would have or should have accurately perceived that fact." *Torres v. City of Madera*, 648 F.3d 1119, 1124 (9th Cir. 2011). That is because "not all errors in perception . . . are reasonable." *Id.*

Case No. 17-CV-03860-LHK
ORDER DENYING DEFENDANTS' POST-TRIAL MOTIONS

United States District Court
Northern District of California

In *Jensen v. City of Oxnard*, for instance, liability turned on whether Sergeant Christian shot the decedent "in conditions in which he should have been able to recognize that the figure he was shooting was a fellow officer." 145 F.3d 1078, 1086 (9th Cir. 1998). The relevant factors included, *inter alia*, the distance at which the shooting took place. *Id.* But again, Defendants never argued to the jury that the shooting occurred under conditions in which they could not accurately perceive the position of Nunez's arms. Nor did Defendants present evidence to that effect. On the contrary, Defendants emphasized the reliability of Defendants' testimony that Nunez pointed the gun at officers.

The only evidence Defendants cite in support of their theory is that (1) "neither Santos nor Vizzusi fired their rifles the first time Nunez came out onto the porch of the house," and (2) "the undisputed evidence established they shot Nunez almost simultaneously." Def. Mot. at 11. The pieces of evidence to which Defendants point certainly could support an inference of a reasonable mistake of fact—but they do not compel such a finding. Defendants' argument is essentially that they *must* have made a reasonable mistake of fact and thought that Nunez pointed his gun at officers because they both shot him. However, a mistake is not reasonable simply because two officers made it. The jury could have found that both Defendants mistakenly believed Nunez was pointing a gun at officers, but that the mistake was not reasonable under the circumstances.

In sum, considering the record in the case, the Court holds that substantial evidence supports the jury's finding that Defendants' use of deadly force was not reasonable and thus constituted excessive force.

### 2. The Constitutional Right Was Clearly Established

Having found that Nunez's constitutional right to be free from excessive force was violated, the Court now turns to the question of whether that right was "clearly established" at the time of the violation. As explained above, qualified immunity is a question of law. Hence, although the jury returned a verdict in favor of Plaintiffs, the jury could not and did not answer the legal question of whether Nunez's constitutional right was clearly established. Instead, the Court must apply the qualified immunity framework to the facts that the jury found. For the reasons

26

United States District Court
Northern District of California

below, the Court holds that Defendants' actions constituted excessive force under clearly

established Fourth Amendment law.

At the outset, the Court is mindful of the "longstanding principle that 'clearly established law' should not be defined at a high level of generality," which the U.S. Supreme Court recently reiterated in *White v. Pauly*. 137 S. Ct. 548, 552 (2017) (internal quotation marks omitted). That is, "[t]he clearly established law must be particularized to the facts of the case." *Id.* In the rare qualified immunity case that goes to trial, "the jury's view of the facts must govern [the court's] analysis once litigation has ended with a jury's verdict." *A.D. v. California Highway Patrol*, 712 F.3d 446, 457 (9th Cir. 2013). Accordingly, the Court begins by identifying the facts that the jury found.

In the usual case, courts infer those facts from the jury's verdict and the theories presented at trial. *See Willis*, 680 F. App'x at 591 ("Since the jury concluded that the force used was not justified, it must have concluded that Willis was not reaching for the gun and thus did not pose an immediate threat of harm when Officer Catton fired."); *e.g.*, *Thomas v. Cannon*, 289 F. Supp. 3d 1182, 1214 (W.D. Wash. 2018) ("Because the jury found Defendants liable, and because none of the Defendants requested special verdicts on any factual issues, all factual disputes shall be resolved in favor of Plaintiffs."); *Westfahl v. D.C.*, No. 11-CV-02210 (CRC), 2015 WL 6746479, at *5 (D.D.C. Nov. 4, 2015) ("Because the Court's inquiry arises in the context of post-verdict motions, it must consider the evidence in the light most favorable to Westfahl as the nonmoving party."). Here, the Court's task is made significantly easier by the questions on the verdict form. The jury responded "No" to the questions, (1) "Was Decedent Anthony Nunez pointing a gun at officers at the time Defendant Michael Santos shot Decedent Anthony Nunez?" and (2) "Was Decedent Anthony Nunez pointing a gun at officers at the time Defendant Anthony Vizzusi shot Decedent Anthony Nunez?" In other words, the jury explicitly concluded that Nunez did not point a gun at officers. This accords with Plaintiffs' version of events at trial, under which Nunez had his arms at his side when he was shot. Defendants, meanwhile, do not present any other theory under which Nunez posed an immediate threat of harm to officers. Accordingly, the Court

United States District Court
Northern District of California

concludes that the jury found Nunez did not point the gun at officers and that he thus did not pose an immediate threat of harm.

As explained above, it is indisputable that "the constitutional right to be free from the use of deadly force absent an immediate threat of harm to officers or others was clearly established" at the time of Defendants' actions. *Willis*, 680 F. App'x at 591 (regarding a 2009 incident); *see Garner*, 471 U.S. 1, 11 (1985). The Ninth Circuit has reaffirmed the U.S. Supreme Court's holding in *Garner* on multiple occasions. *See, e.g.*, *Wilkinson v. Torres*, 610 F.3d 546, 550 (9th Cir. 2010) ("Case law has clearly established that an officer may not use deadly force to apprehend a suspect where the suspect poses no immediate threat to the officer or others."). Moreover, the Ninth Circuit has specifically held that "the mere fact that a suspect possesses a weapon does not justify deadly force." *Hayes v. Cty. of San Diego*, 736 F.3d 1223, 1233 (9th Cir. 2013). These precedents place the "constitutional question" of whether the Fourth Amendment has been violated when the decedent did not pose an immediate threat to officers "beyond debate." *Martinez v. City of Clovis*, No. 17-17492, 2019 WL 6520779, at *10 (9th Cir. Dec. 4, 2019).

The Court is "confined to the jury's factual finding" that Nunez did not point a gun at officers and that he therefore did not constitute an immediate threat to officers. *A.D. v. California Highway Patrol*, 712 F.3d at 455. As a result, "[t]his is one of those rare cases in which the constitutional right at issue is defined by a standard that is so 'obvious' that we must conclude—based on the jury's finding—that qualified immunity is inapplicable, even without a case directly on point." *Id.*

## III. DEFENDANT'S MOTION FOR A NEW TRIAL OR REMITTITUR

In their second post-trial motion, Defendants again challenge the jury's liability findings, this time pursuant to Federal Rule of Civil Procedure 59(a). Defendants also attack the damages award of $2.6 million as to Plaintiff Estate's excessive force claim. For the reasons below, the Court denies Defendants' request for either a new trial or remittitur.

### A. Legal Standards

A court "may, on motion, grant a new trial on all or some of the issues . . . for any reason

28

for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a). Relevant here, a trial court may grant a new trial, "even though the verdict is supported by substantial evidence, if the verdict is contrary to the clear weight of the evidence, or is based upon evidence which is false, or to prevent, in the sound discretion of the trial court, a miscarriage of justice." *United States v. 4.0 Acres of Land*, 175 F.3d 1133, 1139 (9th Cir. 1999). The decision to grant a new trial falls within the sound discretion of the trial court. *Kode v. Carlson*, 596 F.3d 608, 611 (9th Cir. 2010). However, a court should not grant a new trial unless it is "left with the definite and firm conviction that a mistake has been committed." *Landes Constr. Co. v. Royal Bank of Can.*, 833 F.2d 1365, 1372 (9th Cir. 1987) (internal quotations omitted). On the other hand, a trial court may deny a motion for a new trial unless "there is an absolute absence of evidence to support the jury's verdict." *Hung Lam v. City of San Jose*, 869 F.3d 1077, 1084 (9th Cir. 2017) (internal quotation marks omitted). In considering a Rule 59(a) motion, the court "is not required to view the trial evidence in the light most favorable to the verdict. Instead, the district court can weigh the evidence and assess the credibility of the witnesses." *Experience Hendrix L.L.C. v. Hendrixlicensing.com Ltd.*, 762 F.3d 829, 842 (9th Cir. 2014).

The Defendants here challenge, *inter alia*, the sufficiency of the evidence supporting the jury's damages award. "Generally, a jury's award of damages is entitled to great deference, and should be upheld unless it is clearly not supported by the evidence or only based on speculation or guesswork." *In re First All. Mortg. Co.*, 471 F.3d 977, 1001 (9th Cir. 2006) (internal quotation marks omitted). If the damages award is supported by the evidence, it "must be affirmed unless it is 'grossly excessive' or 'monstrous' or 'shocking to the conscience.'" *Brady v. Gebbie*, 859 F.2d 1543, 1557 (9th Cir. 1988).

On the other hand, if a court finds that the amount of a damages award is not supported by the evidence, it has the option of ordering a new trial or reducing the award via remittitur. The Ninth Circuit has made clear that "a new trial is not required even where there is an excessive damages award resulting from passion and prejudice, unless there is also evidence that passion and

prejudice affected the liability finding." *Watec Co. v. Liu*, 403 F.3d 645, 655 (9th Cir. 2005) (internal quotation marks omitted). "Where there is no evidence that passion and prejudice affected the liability finding, remittitur is an appropriate method of reducing an excessive verdict, although the district court still retains the option of vacating the judgment and ordering a new trial." *Id.* (internal quotation marks omitted). However, remittitur may still be improper if there is a "genuine issue of fact as to the amount of recoverable damages." *Murray v. Toyota Motor Distributors, Inc.*, 664 F.2d 1377, 1380 (9th Cir. 1982).

## B. Discussion

As noted above, Defendants' Rule 59 motion challenges (1) the jury's liability findings and (2) the damages award for Plaintiff Estate's excessive force claim. The Court finds no cause to disturb either aspect of the jury's verdict.

### 3. Motion for a New Trial as to Liability

Defendants move for a new trial under Rule 59 for the same reason that it sought judgement as a matter of law under Rule 50(b). That is, they believe the jury's liability findings are "against the weight of the evidence." Def. Mot. at 14. As already discussed at length with regard to the Rule 50(b) motion, however, the jury's findings are supported by substantial evidence.

That the Rule 59 standard does not require a court to accept the jury's credibility findings does not change the Court's conclusion. The Court already considered and rejected Defendants' argument that Charles Thomas is not a reliable witness, which Defendants' renew in the instant motion. Def. Mot. at 14-15. The Court affirms its determination that—even without viewing the evidence in Plaintiffs' favor—Thomas's testimony was sufficiently reliable to support the jury's verdict. Because Defendants raise no new arguments, the Court also denies Defendants' motion for a new trial as to liability. *See Go Daddy Software*, 581 F.3d at 966 (summarily affirming the district court's denial of Go Daddy's Rule 59(a) motion for a new trial where "Go Daddy essentially repeats the same arguments that we have examined and rejected above" as to its Rule 50(b) motion).

United States District Court
Northern District of California

### 4. Motion for a New Trial and/or Remittitur as to Damages

Having affirmed the jury's liability finding, the Court now turns to Defendants' challenge to the damages award. The jury in this case awarded Plaintiff Estate of $2.6 million in compensatory damages for its excessive force claim. Defendants contend that a new trial on damages or remittitur is necessary because "the evidence presented at trial does not support the damages awarded by the jury." Def. Mot. at 1.

A Fourth Amendment excessive force claim belongs to the decedent, though it may be asserted on his behalf by his successors in interest. *Moreland v. Las Vegas Metro. Police Dep't*, 159 F.3d 365, 369 (9th Cir. 1998), *as amended* (Nov. 24, 1998). Accordingly, compensatory damages for an excessive force claim are the amount of money that will reasonably and fairly compensate for the harm suffered by the decedent. The Ninth Circuit has specifically held that, in § 1983 cases "where the decedent's death was caused by the violation of federal law," such compensatory damages include "pre-death pain and suffering damages." *Chaudhry v. City of Los Angeles*, 751 F.3d 1096, 1105 (9th Cir. 2014). The Court therefore instructed the jury "to consider Decedent Anthony Nunez's mental, physical, or emotional pain and suffering caused by Defendants Michael Santos and/or Anthony Vizzusi." ECF No. 147 at 28; *see* ECF No. 189, Tr. at 1164. Of course, pain and suffering damages—like all compensatory damages—must be actual and must be proved. *Carey v. Piphus*, 435 U.S. 247, 264 (1978) (rejecting theory that "injury fairly may be 'presumed' to flow from every denial of procedural due process").

Here, Defendants assert that the $2.6 million award could only properly compensate for Nunez's pre-death pain and suffering, and Plaintiffs do not argue otherwise. According to Defendants, "Plaintiffs presented no evidence to establish Nunez suffered any pain or suffering before he died." Def. Mot. at 16. "Given the lack of evidence to support the damages awarded," Defendants say, the Court should conclude that the verdict was instead "a result of jury sympathy for the family of the decedent." *Id.* at 17. Having closely reviewed the trial record in this case, the Court disagrees. The Court finds there is sufficient evidence to support the jury's award of $2.6 million in pain and suffering damages and rejects Defendants' attempt to attribute the verdict to

jury sympathy.

a. **The Jury's Award of Pain and Suffering Damages is Supported by Evidence**

Defendants' first and principal argument is that Plaintiffs presented "no evidence that Nunez survived, . . . not even for a second." Def. Mot. at 16. Defendants point out that "Plaintiffs' counsel never asked Dr. Jorden to opine on how long Anthony Nunez might have lived." Def. Mot. at 16. That much is true. However, the Court rejects Defendants' assumption that such expert testimony is necessary to support pre-death pain and suffering damages. On this issue, the Ninth Circuit's decision in *Southern Pacific Company v. Heavingham* is instructive, and binding. 236 F.2d 406 (9th Cir. 1956). There, as here, the defendant took the position that there was a "lack of evidence of survival and consciousness for a sufficient period of time to permit recovery for pain and suffering." *Id.* at 408–09. Specifically, the defendant contended "it was a mere matter of speculation as to how long the decedent lived and that the known facts are as consistent with the conclusion that he died almost instantly as with a conclusion that he lived for some substantial period of time." *Id.* at 409. The Ninth Circuit disagreed and said:

> We are of the opinion that the jury, being entitled to make use of their general knowledge of the effect of burns upon a human body, could infer that as far as the burns were concerned, Heavingham, although burned upon every portion of his body, would nevertheless not die or lose consciousness immediately but would probably live and have consciousness for an appreciable period of time. And if the jury were of the view that he probably suffocated from the steam, they would have the right to conclude that a man whose breath has been cut off nevertheless would remain conscious for an appreciable period of time.

*Id.* In other words, a jury is entitled to infer from the injuries experienced by the decedent that he survived for some period and experienced pain and suffering during that time.

In the instant case, Plaintiffs presented ample evidence of the nature and extent of the Plaintiffs injuries, from which the jury could infer significant pain and suffering. First, Dr. Jorden described the injuries suffered by Nunez at length. Starting with the gunshot to Nunez's back, Dr. Jorden testified that the bullet "entered the lower left back of Mr. Nunez," traveled in an "upward direction" through his torso, and finally exited on the upper left chest below the collarbone. ECF

United States District Court
Northern District of California

No. 187, Tr. at 477-79.  As the bullet traveled through his torso, it took the following path:

> It then proceeded to enter the left chest cavity where it struck a rib.  It then involved the left lung where we have branches of the airway and blood vessels.  The wound course then continued into the pericardial sac, which is the sac that surrounds the heart.  The bullet wound then caused devastating injuries to the left ventricle of the heart, which is one of the major chambers of the heart in order to pump blood.  The wound course then had devastating effects on two of the four heart valves in the heart.  The wound course then continued to involve the aorta, which is the major blood vessel in the human body.  And then after involving the aorta, the wound course then exited on the upper left chest below the collarbone.

*Id.* at 479-480.  In layman's terms, said Dr. Jorden, the bullet "ripped through Mr. Nunez's heart." *Id.* at 480.  Dr. Jorden further testified that the wound course "cause[d] extensive hemorrhage in the chest cavity" and that Nunez "lost a lot of blood" as a result.  *Id.*  Dr. Jorden later described the shot to Nunez's back as "a devastating injury." *Id.* at 484.

Dr. Jorden next described the gunshot to Nunez's chest, which also traveled through Nunez's torso before exiting through his back.  *Id.* at 482.  Dr. Jorden described the bullet's course as follows:

> It then proceeded into the right chest cavity where it fractured the right third rib.  It then entered into the middle lobe of the right lung where it caused a defect with subsequent bleeding.  It then continued in a downward projection to involve the lower lobe of the right lung.  It subsequently exited the body, fracturing the ninth rib on the right side.

*Id.* at 482-83.  Dr. Jorden testified that the bullet "did significant damage to Mr. Nunez's lungs" and explained that "the lungs are necessary in order for us to breathe." *Id.* at 483.  In addition, photographs of Nunez's back and chest showing the entry and exit wounds were admitted into evidence.  *Id.* at 474, 478, 481-82 (Plaintiffs' Exhibit 39, pages 715, 717, 722-23).

From this evidence regarding Nunez's injuries, the jury reasonably concluded that Nunez experienced pain and suffering as a result of Defendant's gunshots.  Just as the jury in *Heavingham* was "entitled to make use of their general knowledge of the effect of burns upon a human body," 236 F.2d at 409, the jury in the instant case was entitled to make use of their general knowledge of the effect of fractured ribs, damaged lungs, hemorrhage in the chest cavity, and heart trauma.  The severity and variety of these injuries give rise to the natural inference that

United States District Court
Northern District of California

they caused pain and suffering to Nunez.  Moreover, although Dr. Jorden testified that both shots to Nunez's torso "were fatal," *id.* at 484, she did not specify how quickly or slowly Nunez succumbed to his injuries.  In the absence of evidence that Nunez died too quickly to feel any pain, the jury's inference that he experienced severe pain and suffering is reasonable.

In addition, the record contained two other categories of circumstantial evidence supporting the jury's award: (1) the time between the two gunshots, and (2) Nunez's body being handcuffed.  The Court first addresses the time between the two gunshots.  As noted above, (1) Plaintiffs presented evidence that some time—perhaps several seconds—passed between the shots fired by the two Defendants, and (2) Dr. Jorden did not specify which shot ultimately caused Nunez's death.  Hence, the jury could have concluded that the second shot killed Nunez, and that he thus experienced the pain of the first shot for at least the few seconds between shots.

Second, it is undisputed that Nunez was handcuffed after Defendants shot him.  The record includes a photograph of the scene on July 4, 2016 which shows Nunez's body on the ground, and the body is handcuffed.  ECF No. 189 at 991 (Plaintiffs' Exhibit 32, Bates number 0269).  Dr. Jorden also testified that she received the body still handcuffed.  There was no testimony as to why Nunez was handcuffed after being shot.  The jury could therefore reasonably infer that the police handcuffed Nunez after he was shot because he was still showing signs of life.

In sum, the record in this case not only contained substantial evidence regarding the nature and extent of Nunez's injuries, there was also evidence that some time elapsed between the two gunshots and of Nunez's body being handcuffed.  This evidence supports the jury's reasonable inference that Nunez suffered significant pain and suffering before death.  *See Smith v. Cty. of Riverside*, No. EDCV16227JGBKKX, 2019 WL 2902504, at *7 (C.D. Cal. May 28, 2019) ("Though Plaintiff did not present direct evidence of pre-death pain and suffering, the jury had before it evidence from which it could infer that Decedent suffered after the final shot."); *Seawright v. Arizona*, No. CV 11-1304-PHX-JAT, 2013 WL 4758227, at *11 (D. Ariz. Sept. 4, 2013) (holding that where there is "a disputed issue of fact" over whether decedent was alive for any amount of time, there is "enough evidence for a reasonable jury to allow the Estate to recover

34

damages for pre-death pain and suffering").

The Court acknowledges that the record contains no direct evidence of pre-death pain and suffering, such as expert or eyewitness testimony. But as already shown, such evidence "is not essential," *F/V Carolyn Jean, Inc. v. Schmitt*, 73 F.3d 884, 885 (9th Cir. 1995), and in many cases may not even exist. *See also Tortu v. Las Vegas Metro. Police Dep't*, 556 F.3d 1075, 1086 (9th Cir. 2009) ("Compensatory damages may be awarded for . . . emotional distress . . . inferred from the circumstances, whether or not plaintiffs submit evidence of economic loss or mental or physical symptoms."). Meanwhile, Defendants fail to adduce any direct evidence of their own to establish that Nunez did not survive long enough to experience pain and suffering. Nor do Defendants bring any evidence undermining the jury's judgment as to the intensity of Nunez's pain and suffering. "Courts are not free to reweigh the evidence and set aside the jury verdict merely because the jury could have drawn different inferences or conclusions or because judges feel that other results are more reasonable." *Heavingham*, 236 F.2d at 409; *see also Tennant v. Peoria & P. U. Ry. Co.*, 321 U.S. 29, 35 (1944) ("It is not the function of a court to search the record for conflicting circumstantial evidence in order to take the case away from the jury on a theory that the proof gives equal support to inconsistent and uncertain inferences."). Under the present circumstances, the Court declines to disturb the jury's judgment as to Nunez's pain and suffering.

### b. The Jury's Award Was Not a Product of Sympathy, Passion, or Prejudice

Finally, the Court gives no credence to Defendants' attempt to attribute the amount of the jury's award to "sympathy, passion, or prejudice." Def. Mot. at 15. The Court is mindful that "there is no precise rule for estimating damages for bodily pain and suffering." *W. Gas Const. Co. v. Danner*, 97 F. 882, 890 (9th Cir. 1899). After all, pain and suffering cannot be measured "with any degree of mathematical certainty." *Id.* For that reason, the Ninth Circuit has said that "it is sufficient to show to the jury the extent of the injury, and the amount of the verdict must be determined by the jury in the exercise of their sound and deliberate judgment; and it necessarily follows that, unless the amount of the verdict is such as to clearly indicate that it was given under

United States District Court
Northern District of California

passion or prejudice, it should be sustained." *Id.*

Defendants contend that the verdict was in fact the result of "passion or prejudice" and therefore cannot stand. Def. Mot. at 14. Specifically, Defendants make much of the fact that during the trial, "the jurors encountered activists and family members who packed the courtroom and often demonstrated with T-shirts, flags, and a bullhorn outside as jurors entered and exited the courthouse." Def. Mot. 18. However, Plaintiffs' counsel denied that the protests were "coordinated by [his] office or by [his] clients," and Defendants have not cast doubt on that denial. ECF No. 185, Tr. at 114. More importantly, what Defendants fail to recognize is that the Court carefully instructed and questioned the jurors about the protests.

On the very first day of trial, before the first break, the Court instructed the jurors, "If you are asked or approached in any way about your jury service or anything about this case, you must respond that you have been ordered not to discuss the matter and to report the contact to the court." ECF No. 185, Tr. at 56. No juror reported being approached at any point during jury selection or the trial. Also on the first day of trial, the Court asked the parties about the possibility of any protests, and both sides responded that they had not seen any that day. *Id.* at 70. The Court then asked the parties whether the Court should "ask this jury about protests." *Id.* 71. The parties agreed the Court should not do so "unless it becomes an issue." *Id.* at 72. Later that morning, however, the Court updated the parties that "there are protestors outside." *Id.* at 114. At that point, the parties agreed to question prospective jurors about the protestors. *Id.* at 115-16. The Court said: "I did want to let you know that there are demonstrators on the Second Street entrance to the courthouse. . . . Please raise your hand if you could not be fair and impartial as a juror in this case because of any demonstrators outside the courthouse." *Id.* at 134-35. No hands were raised. *Id.* at 135.

Finally, the Court gave the following preliminary jury instruction:

> You must follow the law as I give it to you whether you agree with it or not. And you must not be influenced by any personal likes or dislike[s], opinions, prejudices, or sympathy. That means that you must decide the case solely on the evidence before you. You will recall that you took an oath to do so.

36

*Id.* at 216.  The jury was allowed to keep the preliminary jury instructions to refer to throughout

the trial.[1]  *Id.*  It is well-established that juries are presumed to follow jury instructions.  *In re Dan*

*Farr Prods.*, 874 F.3d 590, 595 (9th Cir. 2017).

Thus, in light of the Court's admonishments and the lack of evidence that any jurors were

in fact influenced by the protests, Defendants' contention that "the verdict was a result of

sympathy for the family of the decedent," *id.* at 17, is pure conjecture.  *See United States v.*

*Molina-Ontiveros*, 919 F.2d 146, 146 (9th Cir. 1990) ("It is presumed the jury followed the court's

instructions.  There is nothing to indicate the jury did not.") (unpublished).

Defendants also raise the specter that the jury was unduly swayed by statements Plaintiffs'

counsel made during his closing arguments regarding the "value of life."  Def. Mot. at 17; ECF

No. 200 ("Reply") at 10 n. 3.  It is true that, during closing arguments, Plaintiffs' counsel made

statements about how "precious" life is.  ECF No. 190, Tr. at 1258.  For instance, he said that

pilots are instructed to eject if their plane is going down "because the pilot's life is more precious

than that 20-, 30-, $40 million aircraft."  *Id.*  Plaintiffs' counsel also stated that "secretaries who

are at Google or some other startup that go public . . . go from making a living wage . . . to

becoming multimillionaires."  *Id.* at 1233.  Based on these statements, Defendants argue that the

jury's verdict included "lost earnings," which are "economic damages."  Reply at 10.  To begin

with, the Court notes that Defendants failed to object during closing arguments.  "Given defense

counsel's failure to do so, Defendants have waived any claim of error or prejudice."  *Cotton ex rel.*

*McClure v. City of Eureka, Cal.*, 860 F. Supp. 2d 999, 1016 (N.D. Cal. 2012).

In any event, Defendants have failed to establish prejudice.  Plaintiffs' counsel never

connected the statements at issue to Nunez or Nunez's earnings.  Meanwhile, Cervantes testified

that Nunez worked at Mi Pueblo, a grocery store.  ECF No. 186, Tr. at 286, 293.  Nunez's aunt

Sandy Sanchez testified that Nunez did not graduate from high school, ECF No. 187, Tr. at 690,

and that he had previously been at group homes and a ranch before obtaining the Mi Pueblo job,

---

[1] In addition, the parties stipulated that the jury could keep the preliminary jury instructions during
deliberations.  ECF No. 189, Tr. at 1169.

Case No. 17-CV-03860-LHK
ORDER DENYING DEFENDANTS' POST-TRIAL MOTIONS

United States District Court
Northern District of California

1    *id.* at 692. There is no reason to think that the jury believed Nunez's actual lost earnings were

2    commensurate with those of a secretary present during Google's IPO.

3          Most importantly, as Defendants concede, the Court did not instruct the jury that they

4    could consider economic damages. ECF No. 189, Tr. at 1138, 1164. The final jury instructions

5    stated, "[Y]ou should consider decedent Anthony Nunez's mental, physical, or emotional pain and

6    suffering caused by Defendants Michael Santos and/or Anthony Vizzusi." ECF No. 147 at 28; *see*

7    ECF No. 189, Tr. at 1164. Again, juries are presumed to follow jury instructions. *In re Dan Farr*

8    *Prods.*, 874 F.3d at 595. Hence, there is no basis in the record for the notion that the jury's award

9    was based on lost earnings instead of pain and suffering. The Court rejects Defendants' claims

10   that the jury was improperly influenced by passion or prejudice.

11         With that, the Court concludes that the jury's award of damages for Nunez's death pain

12   and suffering was supported by sufficient evidence and not the product of sympathy, passion, or

13   prejudice. There are therefore no grounds for a new trial or remittitur.

14   **IV.    CONCLUSION**

15         For the foregoing reasons, the Court DENIES Defendants' motion for judgment as a matter

16   of law and the motion for a new trial or remittitur.

17   **IT IS SO ORDERED.**

18

19   Dated: December 13, 2019

20                                                    *Lucy H. Koh*
                                                      _____
21                                                    LUCY H. KOH
                                                      United States District Judge
22

23

24

25

26

27

28
                                                  38